724 So.2d 40 (1997)
Gregory Eugene WOODS
v.
STATE.
CR-95-1797
Court of Criminal Appeals of Alabama.
April 18, 1997.
Opinion on Return to Remand and on Application for Rehearing May 8, 1998.
Second Rehearing Denied June 19, 1998.
Certiorari Denied October 16, 1998.
*42 Mike Crespi, Dothan, for appellant.
Bill Pryor, atty. gen., and LaVette Lyas-Brown, asst. atty. gen., for appellee.
Alabama Supreme Court 1971751.
COBB, Judge.
The appellant, Gregory Eugene Woods, was convicted of child abuse, a violation of § 26-15-3, Ala. Code 1975. He was sentenced to five years in the penitentiary and was also ordered to pay a $500 fine and a victim's compensation assessment of $100.
Woods argues that the trial court erred in ruling that he had not established a prima facie case of gender discrimination in the state's exercise of its peremptory strikes. See, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).[1] We agree.
The trial record reflects that the prosecution used all seven of its peremptory strikes to remove male veniremembers. After Woods objected on this ground, the trial court ruled initially that he had established a prima facie case of gender-based discrimination. (R. 55.) However, after the prosecution noted that Woods had exercised six of his seven strikes against females, the trial court reversed its initial ruling on the ground that the state's exercise of its peremptory strikes did not substantially alter the composition of the jury with regard to gender.
In Ex parte Branch, 526 So.2d 609 (Ala. 1987), the Alabama Supreme Court discussed a number of relevant factors a defendant could present in attempting to establish a prima facie case of racial discrimination. These factors, restated by the Alabama Supreme Court with regard to gender-based Batson challenges in Ex parte Trawick, 698 So.2d 162, 168 (Ala.1997), are:
"(1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate *43 examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender."
In Ex parte Thomas, 659 So.2d 3 (Ala. 1994), the Alabama Supreme Court held that by objecting to the prosecution's use of 9 of its 10 strikes against black veniremembers, the defendant made a prima facie showing of a Batson violation. This Court has applied Thomas in a situation where the prosecution had exercised all of its strikes against veniremembers of the same gender in Alexander v. State, 673 So.2d 791 (Ala.Cr.App.1995).
Based on the above holdings, we conclude that Woods made a prima facie showing of gender discrimination in the prosecution's exercise of its peremptory strikes. Because Woods made a prima facie showing, the prosecution must give its reasons for its strikes. We remand this cause to the circuit court for an evidentiary hearing to determine whether the prosecution exercised any of its strikes in a discriminatory manner with regard to gender. The circuit court must determine if the prosecution's reasons are gender-neutral. The circuit court is to file a return to this court within 90 days of the date of this opinion, and in that return is to include a transcript of any testimony taken, as well as the court's written findings and conclusions.
REMANDED WITH DIRECTIONS.
All the Judges concur.

On Return To Remand and On Application for Rehearing
COBB, Judge.
The opinion of March 6, 1998, is withdrawn and the following is substituted therefor.
Gregory Eugene Woods was convicted of child abuse. See § 26-15-3, Ala. Code 1975. He was sentenced to five years' imprisonment and was ordered to pay a $500 fine and a $100 victims compensation assessment. On April 18, 1997, we remanded this case to the trial court in order to give the prosecution an opportunity to come forward with gender-neutral explanations for its use of peremptory strikes of prospective jurors.

Facts
The State's evidence tended to show the following. On September 17, 1994, at about 9:30 p.m., Woods's 13-month-old son was brought to the emergency room of Southeast Alabama Medical Center in Dothan. He was treated for severe second-degree burns, mostly to the lower portion of his body.
Dr. Jones Salna, the physician who treated the child in the emergency room, testified that the child was in shock when he was admitted to the hospital. Dr. Salna testified that the burns covered 28% of the child's body and that they appeared to be immersion-type burns, indicating that the child had been placed in scalding water. Dr. Salna testified that there was evidence that the child had been held in the scalding water. There were no splash-mark burns, which would have been consistent with the boy's attempting to get out of the scalding water. Dr. Salna testified that, in his opinion, the burns were more than 24-hours old when the child was admitted to the hospital; the burns were dry and "brownish" in color, and there were no accompanying blisters. He further testified that the child was bruised about his face and lower extremities. Dr. Salna testified that the child's injuries were consistent with "child-torture" and that when he arrived at the emergency room they were life-threatening.
Sergeant Alton Miller, Jr., of the Dothan Police Department testified that he investigated a report of child abuse and assault against Woods and his wife, Shirley Jean Woods. Miller testified that Woods voluntarily gave a statement to police officers concerning his child's injuries. Woods told police that the child had been in the bathtub and that his oldest son had turned on the hot water in the bathtub and had scalded his younger brother. Woods stated that he promptly removed the child from the bathtub, and after noticing that the child was burned, treated the child's injuries by applying medication and butter to the burns. Woods admitted to police that he noticed the skin peeling off his son's legs as a result of the burns. Woods told police that he was afraid to take the child to the hospital because *44 he feared that authorities would accuse him and his wife of child abuse based on the bruises on the child's body. Woods testified that he sought emergency treatment for his child only after a relative told him that she would call an ambulance if he did not. Woods denied that he or his wife caused any of the child's injuries.
Officer Miller testified that he went to Woods's trailer with Woods's oldest son. Miller testified that the boy could not reach the hot water knob of the bathtub where his brother was allegedly burned. The boy could, however, reach the cold water knob. Miller testified that he measured the temperature of the hot water from the bathtub faucet at approximately 162 degrees Fahrenheit.
Louise Walters, a relative of Woods, testified that Woods telephoned her on September 17, 1994, and asked her about getting bandages for his child's burns. Walters testified that she later asked the child's mother about the extent of the child's burns and the mother's reply was that the burns were "big and real bad." Walters testified that she was aware that the child had lost all of his toes except his big toes as a result of the burns.
Dr. James Jones, medical director for Southeast Alabama Medical Center, testified that the child was in critical condition when he was admitted to the hospital. Dr. Jones testified that the burns appeared to have been intentionally inflicted.
Woods's wife, Shirley Jean Woods, testified for the defense that the burns were accidental. Shirley Woods testified that she accidentally burned the child when she turned the hot water on while he was seated in the bathtub. She testified that she did not mix the hot water with cold water as was her normal practice because she was angry with the child, who would not stop crying. She testified that she left the child in the bathtub and went into the kitchen to cook. Shirley Woods additionally testified that she had entered a plea of guilty to a charge of first-degree assault in connection with the child's injuries.

I.
We first address the State's explanations for its peremptory strikes against male veniremembers, which were offered at a hearing held pursuant to our remand order.
In reviewing the trial court's ruling that there was no Batson violation, we apply the following analysis and standard of review:
"`[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.' Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Where the challenged party's explanations for its strikes are a part of the record, the appellate court will review those explanations regardless of the manner in which they came into the record. See, e.g., Huntley v. State, 627 So.2d 1013, 1016 (Ala.1992); Jackson v. State, 594 So.2d 1289, 1293 (Ala.Crim.App.1991); Williams v. State, 548 So.2d 501, 504 (Ala.Crim.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). Additionally, `[a] circuit court's ruling in a Batson objection is entitled to great deference and we will reverse a circuit court's Batson findings only if they are "clearly erroneous." `Ex parte Branch, 526 So.2d 609, 625-26 (Ala.1987)."
Dallas v. State, 711 So.2d 1101, 1104 (Ala.Cr. App.1997).
At the hearing on remand, the State gave the following reasons for its peremptory strikes against each male veniremember:
The State explained that it struck veniremembers M.W. and W.W. because they responded favorably to a question asked by the defense attorney and because they had no children. Veniremember N.W. was struck because he was a neighbor of one of the defense attorneys. Woods did not challenge these explanations.
Because Woods did not challenge any of these reasons offered for these strikes as pretextual in nature, we hold that the State *45 clearly articulated reasons for the strikes of M.W. and W.W., and N.W. that were sufficiently gender-neutral to support the trial court's denial of the Batson challenge.
The State explained that it struck veniremember D.W. because it had information that he had previously been convicted of the offense of driving under the influence. Another juror, R.W., was struck because he had been issued a citation from a game warden for exceeding a bag limit. Woods did not challenge the validity of either the conviction or the citation. He argues instead that because the prosecution did not conduct individual voir dire examination of either of these veniremembers regarding their alleged past illegal activity, the strikes were pretextual.
This court has consistently held that the fact that a veniremember, or even a close relative of the veniremember, has a record of past illegal activity is a legitimate reason for exercising a peremptory strike against the veniremember. See Thomas v. State, 611 So.2d 416, 418 (Ala.Cr.App.), cert. denied, 611 So.2d 420 (Ala.1992); Baker v. State, 555 So.2d 273 (Ala.Cr.App.1989). The trial court did not err in denying Woods's Batson motion as to these two veniremembers.
Woods specifically challenged the reasons given by the prosecution for its peremptory strikes of A.T. and A.G. as violating Batson. Woods argues that these strikes were discriminatory because, he says, the State excluded these veniremembers solely because of their perceived low socioeconomic status.
The prosecution stated the following as its reasons for striking the two veniremembers:
"[PROSECUTOR]: The next strike for the State was number 134, [A.T.]. The State's notes, my notes, again indicate that he lives in an apartment on Denton Road here in Dothan, that he presented a very poor appearance. He sat in the back row on the first day of jury selection.
"Now, the State would point out that in this case we wantedin this particular case, we wanted people who were more affluent, who had a stronger economic or financial background. And I did not think, based on his appearance in court as he presented himself, and also living in an apartment on Denton Road, that he had a particular kind of background.
"The defendant in this case lived either in the Raymond's Trailer Park or the Garden Estates Trailer Park. I think it was Raymond's at the time the baby was burned in this case.
"And I have ridden through both of those trailer parks in connection with preparing other cases for trial. I have seen the trailer parks, especially Raymond's Trailer Park. And I would state to the Court that Raymond's is a tough place to live. It's a poor area. It's a depressed area. It's not a very well kept area at all. I would not want to live there.
"And the defendant having lived there I think would present a defendant who would be sympathetic to people who were closer to him as far as their socioeconomic status was concerned. And so the fact that the man lived in an apartment on Denton Road motivated me, in addition to his appearance."
(S.R. 5-6.)[1]
"[Prosecutor]: The last strike by the state of a juror, that was [A.G.]. My notes again indicate that he appeared disinterested during voir dire. He sat on the back row during the first day. And by that I mean the first day of jury qualifications in the courtroom on the fourth floor, which is the large courtroom where all of the jurors gather for their initial qualifications for service for that week. He sat on the very back row there.
"And this is just a note. It's a candid note, but it's something that I do in a shorthand way that helps me remember people. I wrote the word `slob' down to describe or help me remember his appearance. He presented a very poor appearance.
"I noted that he lived in Ford Country. And I have nothing against people who live in Ford Country. But, based on my *46 knowledge of Ford Country, that subdivision, I can say it's a smaller subdivision. It's a less affluent subdivision. It's not as affluent as, say, some subdivisions in the northern or northwestern part of the city of Dothan.
"And that again was a factor which motivated me in this particular case because of the defendant's background and where the defendant had lived. I thought that someone of a lower economic status or who lived in a subdivision that was not as affluent as others in this city would tend to sympathize or relate more to the defendant who lived in Raymond's Trailer Park.
(S.R. 8-10.)
Woods argues that the prosecution used its peremptory strikes to discriminate along economic lines and that it thereby violated his constitutional rights to be tried by an impartial jury and to the equal protection of the law.
We first note that the socioeconomic status of these two jurors was not the only reason the State gave for striking them. The prosecutor commented that both presented a "poor appearance" in court. Additionally, the prosecutor noted that A.G. appeared disinterested in the proceedings.
In Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the reasons given for the contested peremptory strike of a black venirememberthat the juror had long, unkempt hair, a moustache, and a beardwere found to be a nondiscriminatory reason for striking him in a race-based Batson challenge because "`[t]he wearing of beards is not peculiar to any race.'" Id., 514 U.S. at 769, quoting EEOC v. Greyhound Lines, Inc., 635 F.2d 188, 190 n. 3 (3d Cir. 1980). Additionally, this court has previously held that the fact that a veniremember was inattentive or disinterested in the proceedings was a legitimate reason for exercising a peremptory strike against that veniremember. Mathews v. State, 534 So.2d 1129, 1130 (Ala.Cr.App.1988) (explanation that juror "didn't seem very attentive upheld against a Batson challenge."); Nesbitt v. State, 531 So.2d 37 (Ala.Cr.App.1987) (explanation that a juror "appeared to be inattentive" held to be neutral reason); Smith v. State, 531 So.2d 1245, 1248 (Ala.Cr.App.1987) (explanation that juror "appeared to be asleep or inattentive" held to be neutral reason).
We are aware of no case in which a strike based on a veniremember's economic status alone, which was not found to be a pretext for the exclusion of jurors on the basis of race, has been found to violate Batson and its progeny. This court has found peremptory strikes based on a veniremember's employment status or based upon the neighborhood where the veniremember resides to violate Batson where the selection criteria results in a disparate impact upon the members of one race. See Carter v. State, 603 So.2d 1137 (Ala.Cr.App.1992). In Hernandez v. New York, 500 U.S. 352, 362, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the United States Supreme Court held that an "[e]qual protection analysis turns on the intended consequences of government classifications. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality." Applying these same principles to the gender challenge in the present case, we conclude that Woods has failed to show any disparate impact. We find no evidence in the record to indicate that the prosecution's striking of veniremembers it felt would sympathize with Woods because of the prosecution's belief that the veniremembers were at or near Woods's socioeconomic level resulted in a disparate number of strikes being exercised against males. Woods argues that the trial court's denial of his motion to record voir dire examination prejudiced him for purposes of this argument. However, he made no offer of proof that the prosecution's selection criteria actually had a disparate impact on male veniremembers or that female veniremembers with identical socioeconomic characteristics were not struck for the same reason.
Finally, we must give great deference to the trial court's findings as to the prosecution's alleged discriminatory intent.
"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding `largely will *47 turn on evaluation of credibility.' 476 U.S., at 98, n. 21, 106 S.Ct., at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984)."
Hernandez, 500 U.S. at 365, 111 S.Ct. 1859.
Because none of the reasons given by the prosecutor appear to be a pretext for excluding veniremembers of one gender from jury service, the trial court's denial of Woods's Batson challenge was not clearly erroneous. In addition to his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), challenge, Woods raised four other issues on appeal, which we address below.

II.
Woods argues that the trial court committed reversible error in denying his motion to record the voir dire examination. Woods alleges that the denial of the motion was an abuse of discretion by the trial judge. He also argues that Rule 19.4, Ala.R.Crim.P., which provides that the recording of voir dire in noncapital cases is discretionary with the trial court, violates the Due Process Clause of the United States Constitution and the Alabama Constitution. Both arguments are without merit.

A.
Woods argues that, because he made a gender-based Batson motion, the trial court necessarily abused its discretion in denying a pretrial motion to record the entire voir dire, because "the trial court's arbitrary denial of the voir dire motion may have a preclusive effect on the substance of the Batson issue arising in this case."
A review of the record reveals that over 50 pages of voir dire questioning was recorded and transcribed. Woods's argument to the trial court in support of his Batson challenge is also contained in the record. In addition, this court remanded this case to the trial court in order to record the prosecution's gender-neutral reasons for its strikes. This court, in addressing an identical argument, has said:
"Because Rule 19.4, Ala.R.Crim.P., vests the trial court with discretion as to whether [voir dire] proceedings should be transcribed, and because in the instant case, the appellant's claim of discrimination in the striking of the jury may be determined by an examination of the record, there was no abuse of discretion."
Carroll v. State, 701 So.2d 47, 51 (Ala.Cr. App.1996).
The trial court did not abuse its discretion in denying Woods's motion to record voir dire.

B.
Woods argues that Rule 19.4(b), Ala. R.Crim.P., "frustrates defendants in the exercise of rights granted to them under the Due Process Clause of the United States and Alabama Constitutions" because, he says, it grants "carte blanche authority to the trial bench to deny recordation of voir dire in noncapital cases."
Rule 19.4(b), Ala.R.Crim.P., provides:
"In all noncapital cases, the court reporter shall take full stenographic notes of the voir dire of the jury and of the arguments of counsel if directed to do so by the trial judge."
Rule 19.4(b) leaves it within the discretion of the trial court whether to direct the recording of voir dire explanation in noncapital cases. Thus, it is not the application of Rule 19.4(b), but only an abuse of discretion by a trial judge in applying Rule 19.4(b), which would result in a violation of a defendant's due process rights. As noted above, the trial court did not abuse its discretion in denying Woods's motion to record voir dire. Therefore, Woods was not denied his rights to due *48 process guaranteed by the United States Constitution and the Alabama Constitution.

III.
Woods argues that the trial court erred in denying his motion for a judgment of acquittal on the grounds that the State failed to prove a prima facie case of child abuse. Specifically, Woods argues that the State's evidence in this case, which was circumstantial in nature, was insufficient to submit the case to a jury. We find this argument to be without merit.
Section 26-15-3, Ala. Code 1975, provides: "A responsible person, as defined in Section 26-15-2, who shall torture, willfully abuse, cruelly beat or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be punished by imprisonment in the penitentiary for not less than one year nor more than 10 years." Section 26-5-2 defines a "responsible person" as "a child's natural parent, stepparent, adoptive parent, legal guardian, custodian or any other person who has the permanent or temporary care or custody or responsibility for the supervision of a child."
"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."
Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr. App.), cert. denied, 368 So.2d 877 (Ala.1979), citing United States v. Black, 497 F.2d 1039 (5th Cir.1974). Additionally, circumstantial evidence may form the proof of the corpus delicti; "`[i]f facts are presented from which the jury may reasonably infer that the crime has been committed the question must be submitted to the jury.'" Breeding v. State, 523 So.2d 496, 500 (Ala.Cr.App.1987), quoting Suggs v. State, 403 So.2d 309, 313 (Ala.Cr. App.1981).
Woods concedes in his brief to this court that the evidence when viewed in a light most favorable to the state "might show that Gregory Woods failed to act promptly to alleviate [the child's] suffering." Woods's argument apparently relies on the assumption that because the evidence did not directly implicate him as the person who caused the burns, he cannot be guilty of child abuse.
The willful maltreatment of a child is encompassed in the definition of child abuse set out in § 26-15-3, Ala. Code 1975. While the statute does not define the term "willfully maltreat," that term, like the other terms used in the statute, such as "torture" and "willfully abuse," can be defined by general or common usage and provides an appropriate yardstick for a jury to measure certain conduct. See Chambers v. State, 364 So.2d 416 (Ala.Cr.App.), cert. denied, 364 So.2d 420 (Ala.1978). This court has held that the child abuse statute encompasses acts of omission as well as those of commission. Phelps v. State, 439 So.2d 727 (Ala.Cr.App. 1983). Thus, willful maltreatment may result from a willful act or omission that evidences such a serious disregard of the consequences as to cause harm or to threaten harm to a child's health or welfare. See § 26-14-1, Ala. Code 1975. This may include a willful denial of medical care. Although the issue whether the willful denial of medical care constitutes willful mistreatment for purposes of the child abuse law is a question of first impression in the State of Alabama, this issue is well settled in other jurisdictions. State v. Williquette, 129 Wis.2d 239, 385 N.W.2d 145 (1986); State v. Scott, 400 So.2d 627 (La.1981); State v. Fabritz, 276 Md. 416, 348 A.2d 275 (1975).
The State presented sufficient evidence in the present case to support, at the very least, a conviction of child abuse on the theory of the willful omission of medical care. It is clear from the evidence that Woods was aware of the severe nature of his child's burns and that he did not seek medical treatment for his son because he was afraid that he and his wife would be accused of child abuse. We hold that a responsible person who willfully denies medical treatment to a child who is obviously seriously injured is as culpable as a responsible person who actually causes the injury to a child.
*49 The trial court did not err in denying Wood's motion for a judgment of acquittal.

IV.
Woods argues that the trial court erred in refusing one of his requested jury charges. Woods argues that the trial court's refusal to give the charge, which read, "[c]ircumstantial evidence that points to the guilt or innocence of the defendant is as good as eyewitness evidence," was so prejudicial that it constituted reversible error. Woods argues that he was prejudiced because, he says, the failure of the trial court to give the charge resulted in the jury's giving less weight to circumstantial exculpatory evidence.
When requested charges are either fairly and substantially covered by the trial court's oral charge or are confusing, misleading, not predicated on a consideration of the evidence, argumentative, abstract, a misstatement of the law, or contain misspelled or misused words that would tend to confuse the jury, the trial court may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).
Our review of the trial court's charge reveals that the instructions adequately protected Woods from any prejudice. The trial court thoroughly instructed the jury regarding direct and circumstantial evidence. It also instructed the jury that in order to reach a jury verdict based on either direct evidence alone, circumstantial evidence alone, or a combination of direct and circumstantial evidence, it must be convinced beyond a reasonable doubt of his guilt. (R. 289-90.)
The trial court did not abuse its discretion in refusing to give Woods's requested jury charge.

V.
Woods argues that the trial court erred in giving the four jury charges the State requested because, he says, they were incorrect statements or incomplete statements as to the law of child abuse or were vague or incomprehensible.
The following charges are encompassed in Woods's objection:
"THE COURT: [State's requested charge #1:] Now, I charge you that the offense of child abuse encompasses and includes those acts of omission as well as those of commission.
"[State's requested charge # 2:] I charge you that the State of Alabama is not required to prove to you that the defendant by his physical actions abused or maltreated the victim in this case.
"[State's requested charge # 3:] I charge you that if you are convinced beyond a reasonable doubt that the defendant willingly failed to commit certain acts and that this willful failure to commit these acts resulted in the abuse or maltreatment of the victim, you should find the defendant guilty of the offense of child abuse.
"[State's requested charge # 4:] In order for you to find the defendant guilty of child abuse, you must be convinced beyond a reasonable doubt of the following elementsthese are the elements of child abuse. Number one, that the defendant is the natural parent or stepparent or adopted parent or legal guardian or custodian or person having the temporary or permanent care or responsibility for the supervision of [the child]. Number two, you must find that [the child] was a child under the age of 18 years. And number three, you must find that the defendant either tortured, willfully abused, cruelly beat or otherwise willfully maltreated [W.C.W.]; or alternatively that the defendant willfully failed to act in a certain manner and [that] this willful failure or omission to act caused the said child to be abused, tortured, cruelly beaten or maltreated."
(R. 290-92.)
A trial court has broad discretion in formulating jury instructions, provided the charges are an accurate reflection of the law and the facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986).
The above charges are accurate statements of the law. (See Phelps, supra, and our discussion in Part III, of this opinion.) Woods argues that charges 3 and 4 were vague or incomprehensible because the *50 trial court did not specifically state those "certain acts" or "failure to act in a certain manner" upon proof of which the jury could find him guilty of child abuse. We find this argument to be without merit.
The trial judge did not abuse its discretion in giving the four charges requested by the State.
For the above-stated reasons, the judgment of the trial court is due to be, and is hereby, affirmed.
OPINION OF MARCH 6, 1998, WITHDRAWN; OPINION SUBSTITUTED; RULE 39(k) MOTION DENIED; APPLICATION GRANTED; AFFIRMED.
LONG, P.J., and McMILLAN, BROWN, and BASCHAB, JJ., concur.
NOTES
[1] In J.E.B. v. Alabama, 511 U.S. 127, 145, 114 S.Ct. 1419, 1430, the United States Supreme Court held that "the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man."
[1] "S.R." refers to the supplemental record filed with this court on June 3, 1997.