JOINER, Judge.
Jessica Porter Graham was convicted of child abuse, see § 26-15-3, Ala.Code 1975, and was sentenced to five years’ imprisonment. Graham’s sentence was split, and she was ordered to serve two years’ imprisonment followed by three years’ probation. The trial court ordered Graham to pay a $100 fine, a $100 crime-victims-compensation assessment, a $350 bail-bond fee, $2,000 in attorney fees, and court costs.
The State’s evidence at trial tended to show the following: On February 18, 2014, Graham and her husband, Donnell Graham, brought J.G., their seven-week-old child, to the emergency room at Southeast Alabama Medical Center (“SAMC”) because, they claimed, Donnell had fallen down some stairs while he was holding J.G. Dr. James Scott Burrow, a physician at SAMC, testified that he became involved in J.G.’s case after the Department of Human Resources was notified of J.G.’s injuries.
Dr. Burrow testified that an X-ray of the injury for which J.G. was brought to the hospital showed an “obvious break” that had occurred approximately one to three days before that X-ray was taken. (R. 161.) Dr. Burrow and his partner became concerned and conducted a skeletal survey— an X-ray of J.G.’s entire skeletal system— “to look for any other unusual findings.” (R. 161.) The skeletal survey revealed “some old rib fractures” and “a forearm fracture ... that was already healing.” (R. 162.) On one X-ray, Dr. Burrow observed a bone callus, indicating that a fracture on J.G.’s ulna was in the process of *1151 healing.[1] Dr. Burrow explained that a bone callus is a “new bone growth starting to form where a fracture has occurred. And it usually starts ... a week, ten days, maybe a little later after an acute fracture has occurred.” (R. 159-60.) Dr. Burrow testified, “[W]hen you start to see fractures that are in various stages of healing or are old, that is a telltale sign or a huge red flag for us that something has happened and this child has been battered.” (R. 162.) Dr. Burrow testified that babies’ bones are more difficult to break than older children’s and adults’ bones and that it would require a fair amount of force to fracture a baby’s bone. Dr. Burrow testified that, in his opinion, J.G.’s injuries occurred at different times and were intentionally inflicted.
Dr. Lauren Beth Morris, a pediatrician at Southeastern Pediatrics, testified that she examined J.G. the morning following his birth in December 2013. Dr. Morris noted that J.G. had tolerated delivery well and that nothing during her examination of J.G. indicated that he had suffered any trauma during birth. Dr. Morris testified: “I did not see anything on my initial physical exam of him when I examined him the morning after he had been born. I found that he moved both arms equally, both legs equally. He did not seem to be in any pain or discomfort with my exam.” (R. 80.) Dr. Morris testified that J.G.’s test results were negative for brittle-bone disease.
Dr. Morris testified that, from her experience, it is not normal for a seven-week-old child to have suffered multiple fractures. Dr. Morris examined J.G.’s X-rays in court and testified that the fractures “appear to be of different ages ... which means this was more than one event, more than one trauma that occurred. Not just a one-time thing.” (R. 60-61.) Dr. Morris characterized J.G.’s fractures as non-accidental.
Investigator Ronald Hall of the Dothan Police Department testified that he interviewed Graham on February 19, 2014. Investigator Hall testified that Graham informed him that she was J.G.’s caretaker “90 to 95 percent of the time.” (R. 94.) Graham told Investigator Hall that J.G. “had urinated on her while changing a diaper” and that she became “a little aggravated by that.” (R. 94.) Graham further stated that, on February 14, 2014, J.G. was at home alone with Donnell, who “had alleged to have fallen down the steps at the house.” (R. 94.) The following day, Graham requested to speak to Investigator Hall again. Graham informed Investigator Hall that she had forgotten to mention that J.G. had once fallen 10-12 inches off a bed and landed on the floor. Investigator Hall further testified that, “on more than one occasion, [Graham] indicated that she pretty much knew what had caused [J.G.] ’s injuries, and she refused to talk about those incidents.” (R. 94.) Graham informed Investigator Hall that J.G. never received professional medical treatment immediately following any of the incidents during which he may have been injured.
Susié Peters, a juvenile investigator[2] with the Dothan Police Department, also interviewed Graham. Investigator Peters testified:
“She mentioned a few different incidences [sic] that she felt something may have happened to cause an injury. One specifically was she was walking down the stairs, trying to feed him with a *1152 bottle, and he was putting his fingers in his mouth, and it frustrated her, and she pulled his hand away hard, and she—her words were she felt something kind of slip.
[[Image here]]
“... She also referenced changing his diaper, that he would wiggle a lot and sometimes urinate on her, and she would hold his legs down maybe too hard and that that may have caused an injury. And, also, there was a few time[s] in the car seat when he would get tangled in the straps, and she would get frustrated and maybe pull or yank him out too hard.”
(R. 106-07.) Investigator Peters confirmed that Graham never indicated that she sought medical care for J.G. after those incidents. Investigator Peters further testified that Graham felt that Donnell was too rough while handling J.G. and that, to her knowledge, Graham never reported her concerns to health-care or law-enforcement personnel.
Debra Porter, Graham’s mother, testified that, after the Februax-y 18, 2014, emergency-room visit, J.G. was placed in her and her husband’s care. Porter testified that, initially, J.G. was fussy and that he had a splint on his arm. Porter testified that, at the time of trial, J.G. was 19 months old, that he seemed to be a healthy, happy toddler, and that he had suffered no fractures since living with them.
After the State rested, Graham moved for a judgment of acquittal, or, in the alternative, to dismiss the case, stating:
“We believe that the State has failed to show a prima facie case to meet the elements of Alabama code section 26-16-3, under which my client was indicted by the grand jxiry May tei-m 2014.
“That code section basically states that a responsible person, having the responsibility or supervision of a child under the age of 18 years old, does torture, willfully abuse, cruelly beat or otherwise willfully maltreat said child under the age of 18 years old. That’s basically the wording of the statute.
“In this case it’s become—well, first of all, there has been no evidence presented that my client engaged in any such conduct. To submit a case to a jux-y under these circumstances would be asking them to make a ruling based on evidence that is not tied to my client. So, the State has failed to prove that she took any act of said nature to meet the statute.
“Furthermore, we would also like to move to dismiss the case. In the event that the court is not inclined to grant the motion for judgment of acquittal, we would further ask the court to dismiss the case based on the fact that it is our opinion that the indictment is a faulty indictment.
“It’s become evident in this case through trial that because of the lack of evidence against my client, that the State has tried the case on language contained within the indictment that says that the defendant failed to get medical treatment for the child or prevent abuse or neglect from occurring. Basically, your Honor, that is not an element. That’s a phantom element. That is not an element under the statute in which my client is charged under this indictment.
“In addition, any reference to such in this indictment would—just as a matter of argument, would had to have come from—I guess the State would say would have had to come from some case law, as far as failing to get medical treatment.
*1153 “But my client in this case, Your Hon- or—it also says to prevent abuse or neglect from occurring, as if she has to intervene and stop abuse from occurring. And that’s just simply not in the statute.
“If the grand jury relied on that information in this indictment to indict the defendant, then, potentially, this court has no subject matter jurisdiction over the case.
“Furthermore not only could the grand jury have been misled by that wording, this jury, in my opinion, the only way can come to a conclusion of guilt would be under this faulty wording.
“And so, we would ask the court to either grant the judgment of acquittal, first and foremost, based on the lack of evidence against my client, or, in the alternative, to dismiss based on the fact that there is an element in the indictment that is not in the statute.”
(R. 186-89.)
In response to Graham’s motion for a judgment of acquittal, the State argued that it had proven a prima facie case of child abuse and summarized the evidence presented against Graham during its casein-chief. The State asserted that it sought to prove that Graham had committed child abuse on the theory that she had failed to seek medical treatment for J.G. or that she failed to prevent abuse or neglect from occurring. The State clarified that it had elected not to pursue a conviction for child abuse on the theory that Graham had actually caused J.G.’s injuries. The State also explained that “the break on February 14th, 2014, is not what we’re alleging as the child abuse.” (R. 198.)
The trial court denied Graham’s motions. The court explained that it relied on Woods v. State, 724 So.2d 40 (Ala.Crim.App.1997), for the proposition that “the failure or omission to obtain medical treatment” constitutes willful maltreatment of a child—an element of child abuse that is included in § 26-15-3. (R. 193.) The trial court also noted that it would “make it clear to the jury that the State is not pursuing an allegation that [Graham] actually caused the injuries” and that “they would need to disregard the surplusage in the indictment.” (R. 194, 203.)
Graham was ultimately convicted and thereafter filed a timely notice of appeal.
On appeal, Graham contends that the trial court erred when it denied her motion for a judgment of acquittal and her motion to dismiss.
I.
Graham contends that the trial court erred when it denied her motion for a judgment of acquittal because, she says, “the State failed to prove a prima facie case of child abuse.” (Graham’s brief, p. 24.) Specifically, Graham claims that the State failed to present sufficient evidence: (1) that J.G.’s injuries were obvious “serious physical injuries”; (2) that Graham was aware of J.G.’s injuries and that she seriously disregarded the consequences of failing to provide medical treatment to J.G.; and (3) that Graham’s failure to seek medical treatment for J.G. caused or threatened to cause harm to J.G.’s health or welfare.
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala. *1154 Cr.App.1980), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993). In addition,
“ ‘[cjircumstantial evidence is not inferi- or evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’ ”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997) (quoting Ward v. State, 610 So.2d 1190, 1191-92 (Ala.Crim.App.1992)).
Under the State’s theory of child abuse, it had to prove that Graham, J.G.’s natural parent, willfully maltreated J.G. by failing to seek medical treatment for J.G after he sustained the injuries observed in the skeletal-survey X-rays—not the injury for which he was taken to the hospital on February 18, 2014. Section 26-15-3 provides: “A responsible person, as defined in Section 26-15-2, who shall torture, willfully abuse, cruelly beat, or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be guilty of a Class C felony.” Section 26-15-2(4), Ala. Code 1975, includes a “child’s natural parent” in its definition of “responsible person.” Although the Code of Alabama does not define “willfully maltreat,” this Court held in Woods v. State, 724 So.2d 40, 48 (Ala.Crim.App.1997), that “willful maltreatment may result from a willful act or omission that evidences such a serious disregard of the consequences as to cause harm or to threaten harm to a child’s health or welfare” and that “a responsible person who willfully denies medical treatment to a child who is obviously seriously injured is as culpable as a responsible person who actually causes the injury to a child.” Section 26-15-2(5), Ala.Code 1975, incorporates the definition of “serious physical injury” as provided for in § 13A-1-2(14), Ala.Code 1975, which states that a serious physical injury is a “[pjhysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.” Graham argues in her brief on appeal that the State failed to prove that she willfully maltreated J.G. as that term is defined in Woods, supra.
*1155 A.
Graham contends that the State failed to prove that J.G. suffered a serious physical injury. We note, however, that proof of a “serious physical injury” is no longer necessary for a child-abuse conviction under § 26-15-3.
In Woods v. State, supra, Woods claimed that the State failed to prove a prima facie case of child abuse. Specifically, Woods argued that because the State’s evidence “did not directly implicate him as the person who caused the [child’s injuries], he [could] not be guilty of child abuse” under § 26-15-3, which, at that time, provided:
“ ‘A responsible person, as defined in Section 25-15-2, who shall torture, willfully abuse, cruelly beat, or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be punished by imprisonment in the penitentiary for not less than one year nor more than 10 years.’ ”[3]
724 So.2d at 48. This Court then concluded:
“The willful maltreatment of a child is encompassed in the definition of child abuse set out in § 26-15-3, Ala.Code 1975. While the statute does not define the term ‘willfully maltreat,’ that term, like the other terms used in the statute, such as ‘torture’ and ‘willfully abuse,’ can be defined by general or common usage and provides an appropriate yardstick for a jury to measure certain conduct. See Chambers v. State, 364 So.2d 416 (Ala.Cr.App.), cert. denied, 364 So.2d 420 (Ala.1978). This court has held that the child abuse statute encompasses acts of omission as well as those of commission. Phelps v. State, 439 So.2d 727 (Ala.Cr.App.1983). Thus, willful maltreatment may result from a willful act or omission that evidences such a serious disregard of the consequences as to cause harm or to threaten harm to a child’s health or welfare. See § 26-14-1, Ala.Code 1975. This may include a willful denial of medical care. Although the issue whether the willful denial of medical care constitutes willful mistreatment for the purposes of the child abuse law is a question of first impression in the State of Alabama, this issue is well settled in other jurisdictions. State v. Williquette, 129 Wis.2d 239, 385 N.W.2d 145 (1986); State v. Scott, 400 So.2d 627 (La.1981); State v. Fabritz, 276 Md. 416, 348 A.2d 275 (1975).
“The State presented sufficient evidence in the present case to support, at the very least, a conviction of child abuse on the theory of the willful omission of medical care. It is clear from the evidence that Woods was made aware of the severe nature of his child’s burns and that he did not seek medical treatment for his son because he was afraid that he and his wife would be accused of child abuse. We hold that a responsible person who willfully denies medical treatment to a child who is obviously seriously injured is as culpable as a responsible person who actually causes injury to a child.”
724 So.2d at 48.
After Woods was decided, the legislature created a new offense—aggravated child abuse—which is codified at § 26-15-3.1, Ala.Code 1975, and which became effective August 1, 2001. Section 26-15-3.1(a)(3) provides that “[a] responsible person, as defined in Section 26-15-2, commits the crime of aggravated child abuse if he or *1156 she ... violates the provisions of Section 26-15-3 which causes serious physical injury, as defined in § 13A-1-2, to the child” (emphasis added).[4] Causing a serious physical injury in addition to committing child abuse as provided for in § 26-15-3 is one method of committing aggravated child abuse under § 26-15-3.1; therefore, the addition of the element of “serious physical injury” to the provisions of § 26-15-3.1 indicates that a serious physical injury is no longer an element of § 26-15-3. See generally Blockbuster, Inc. v. White, 819 So.2d 43, 46 (Ala.2001) (“Courts must consider subsequent acts passed by the Legislature to clarify previously ambiguous provisions.”); see also Franklin v. State, 23 So.3d 694 (Ala.Crim.App.2008) (holding that a serious physical injury is an element required under § 26-15-3.1(a)(3)—aggravated child abuse—but not under § 26-15-3—child abuse). Accordingly, to present legally sufficient evidence of child abuse under § 26-15-3 in this case, the State was not required to show that J.G. had suffered a serious physical injury.
B.
Graham contends that the State failed to prove that she was aware of J.G.’s injuries and that her failure to seek medical treatment for J.G. evidenced “such a serious disregard of the consequences as to cause harm or to threaten harm to [J.GJ’s health or welfare.”[5] Woods, 724 So.2d at 48.
Initially, we note that the standard Graham relies on in Woods states that “willful maltreatment may result from a willful act or omission that evidences such a serious disregard of the consequences as to cause harm or to threaten harm to a child’s health or welfare.” 724 So.2d at 48 (emphasis added).[6]
Under this standard, in order to prove that Graham willfully maltreated J.G., the State was required to show that Graham was aware of J.G.’s injuries and that she willfully denied getting him medical treatment. “[I]f a criminal statute makes a certain act an offense if it is done willfully, then willfulness is an essential element of the crime.” Phelps v. State, 439 So.2d 727, 732 (Ala.Crim.App.1983). “Willful’ has been defined as ‘[proceeding from a conscious motion of the will.’ ” 439 So.2d at 733 (quoting Black’s Law Dictionary, 1773 (4th ed.1968)).
The State presented circumstantial evidence indicating that Graham was aware of J.G.’s injuries and that she failed to seek medical treatment for him. Investigator Hall testified that Graham informed him: (1) that she was J.G.’s caretaker 90-95 percent of the time; (2) that J.G. had once fallen 10-12 inches from a bed onto the floor; (3) that “she pretty much knew what had caused [J.GJ’s injuries” but “refused to talk about those incidents” (R. 94); and (4) that J.G. never received medical treatment following any of the incidents as a result of which Graham indicated J.G. might have been injured. Investigator Pe *1157 ters testified that Graham informed her that J.G. may have been injured because of Graham’s rough handling of J.G. while she changed his diapers, whenever she removed J.G. from his car seat, and once when she was trying to feed him—specifically when “she pulled his hand away hard and ... she felt something kind of slip.” (R. 106.) Investigator Peters also testified that Graham never indicated that she sought medical care for J.G. after those incidents and further testified that Graham felt that her husband was too rough with J.G. but never reported her concerns to health-care or law-enforcement personnel. Moreover, Dr. Burrow testified that J.G. suffered harm to his health in the form of multiple broken bones over a period of, at most, seven weeks. Dr. Burrow testified that a baby’s bones are harder to break than the bones of an older child’s ór an adult’s, and that it would require a significant amount of force to break a baby’s bone. Dr. Morris testified that, when she examined J.G. after birth, he was healthy and his results for brittle-bone disease were negative.
Viewed in the light most favorable to the State, the State presented legally sufficient evidence that Graham willfully maltreated J.G.—specifically, that Graham was aware of J.G.’s injuries and that she failed to seek medical treatment for him. A showing of severe physical injury was not required. Accordingly, we cannot say that the trial court erred when it denied Graham’s motion for a judgment of acquittal, and Graham is not entitled to relief on this issue.
II.
Graham contends that the trial court erred when it denied her motion to dismiss the indictment against her because, she said, the indictment against her was faulty and, therefore, the trial court had no subject-matter jurisdiction over her case. Specifically, Graham claims: (1) that § 26-15-3 does not criminalize the failure to “prevent abuse or neglect from occurring” (Graham’s brief, p. 34); (2) that the grand jury was not aware of the holding of Woods, supra, and, therefore, “could not have had any way of knowing what the State had to prove” to convict her of child abuse by willful maltreatment (Graham’s brief, p. 35); and (3) that she “was not properly apprised of the charges against her or the conduct which the. State complained of.” (Graham’s brief, p. 35.)
Initially, we note that, even if the indictment against Graham was faulty, the circuit court had subject-matter jurisdiction over her case. See Ex parte Seymour, 946 So.2d 536, 539 (Ala.2006) (the validity of an indictment “is irrelevant to whether the circuit court had jurisdiction over the subject matter of th[e] case”).
The indictment against Graham reads as follows:
“The Grand Jury of said county charge that, before the finding of this indictment, JESSICA PORTER GRAHAM, whose name is otherwise unknown to the Grand Jury, did, while a responsible person, having permanent or temporary care or custody or responsibility for the supervision of said [J.G.], torture, willfully abuse, cruelly beat or otherwise willfully maltreat [J.G.], a child under the age of eighteen (18) years by CAUSING [J.GJ’S CLAVICLE AREAS, RIGHT UPPER ARM, LEFT LOWER ARM, SEVERAL RIBS ON THE LEFT SIDE AND HIS RIGHT UPPER LEG TO BE BROKEN OVER A PERIOD OF TIME AND/OR FAILED TO GET MEDICAL TREATMENT FOR THE CHILD OR PREVENT ABUSE OR NEGLECT FROM OCCURRING, in violation of Section 26-15-3 of the Code of Alabama, *1158 against the peace and dignity of the State of Alabama.”
(C. 4 (capitalization in original).)
As noted above, § 26-15-3, Ala.Code 1975, states that “[a] responsible person, as defined in Section 26-15-2, who shall torture, willfully abuse, cruelly beat, or otherwise willfully maltreat any child under the age of 18 years shall, on conviction, be guilty of a Class C felony.”
“An indictment ‘ “must clearly inform the accused of the offense with which he is being charged and must do so in language that is readily understood by the ordinary person.” ’ Dobyne v. State, 805 So.2d 733, 750 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001), quoting Thatch v. State, 432 So.2d 8, 10 (Ala.Crim.App.1983). Rule 13.2(a), Ala. R.Crim. P., provides that an indictment ‘shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment.' Section 15-8-25, Ala.Code 1975, provides:
“ ‘An indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.’
“However, ‘“[i]t should be borne in mind that under our system of pleading, indictments are rather a statement of legal conclusions, than of facts.’ ” Harris v. State, 580 So.2d 33, 38 (Ala.Crim.App.1990), quoting Hochman v. State, 265 Ala. 1, 3, 91 So.2d 500, 501 (Ala.1956). ‘ “[I]t is not required that an indictment set up the proof necessary to a conviction.” ’ Hochman, 265 Ala. 1 at 3, 91 So.2d at 502, quoting McLain v. State, 15 Ala.App. 24, 72 So. 511, 512 (1916). ‘ “The government need only allege the ‘essential facts necessary to apprise a defendant of the crime charged’ and not its theory of the case.” ’ Hunt v. State, 642 So.2d 999, 1026 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994), quoting United States v. Schmidt, 947 F.2d 362, 369 (9th Cir.1991). In Alabama, ‘ “[a]n indictment is sufficient if it substantially follows the language of the statute violated, provided the statute prescribes with definitiveness the elements of the offense.” ’ Travis v. State, 776 So.2d 819, 836 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), quoting Breckenridge v. State, 628 So.2d 1012, 1015-16 (Ala.Crim.App.1993).”
Vaughn v. State, 880 So.2d 1178, 1192-93 (Ala.Crim.App.2003).
The indictment against Graham tracked the language of and cited the child-abuse statute, § 26-15-3. The indictment further alleged the essential facts necessary to apprise Graham of the crime with which she was charged. Moreover, even if the inclusion of the phrase “failed to ... prevent neglect or abuse from occurring” in the indictment was error, that error was harmless because the trial court did not charge the jury under a theory that Graham had failed to prevent the neglect or abuse of J.G. from occurring. Rather, the trial court instructed the jury that the State was required to prove that Graham failed to seek medical treatment for J.G. after he was injured, and Graham did not object. Accordingly, we cannot say that the trial court erred when it denied Graham’s motion to dismiss, and Graham is not entitled to relief on this issue.
*1159 Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and BURKE, JJ., concur.

. Dr. Burrow explained that "[t]he ulna is the [bone] on the pinkie side, and the radius is on the thumb side” of the forearm. (R. 160.)

. Investigator Peters testified that, at the time of trial, she was the community-services coordinator with the Dothan Police Department.

. Section 25-15-3 was amended in 2006 to substitute "guilty of a Class C felony” for "punished by imprisonment in the penitentiary for not less than one year nor more than 10 years.”

. An amendment effective April 17, 2002, deleted from subsection (a)(3) the phrase “to the child” following "injury.”

. We combine Graham’s specific arguments that do not involve a discussion of "serious physical injury” under subsection I.B. of this opinion.

. The phrase "may result” is not a limiting phrase—that is, it does not set forth the exclusive means by which "willful maltreatment” may be proven. Therefore, the State was not required to prove that Graham willfully maltreated J.G. by showing that Graham seriously disregarded the consequences of not providing J.G. with medical treatment and that such disregard resulted in harm or the threat of harm to J.G.’s health or welfare.