JOINER, Judge.
Douglas Howard Cooner was convicted of three counts of second-degree theft of property, see § 13A-8-4, Ala. Code 1975, two counts of first-degree perjury, see § 13A-10-101, Ala. Code 1975, one count of third-degree perjury, see § 13A-10-103, Ala. Code 1975, and three counts of unauthorized practice of law, see *209 § 34-3-1, Ala. Code 1975.[1] For the second-degree-theft-of-property and first-degree-perjury convictions, Cooner was sentenced to five years' imprisonment; those sentences were split and Cooner was ordered to serve 60 days in the Jefferson County jail followed by two years' probation. For the third-degree-perjury and unauthorized-practice-of-law convictions, Cooner was sentenced to serve six months' in the Jefferson County jail; those sentences were suspended. The circuit court imposed all appropriate fines and fees.[2]
Facts and Procedural History
The State's evidence at trial tended to show (1) that Cooner committed second-degree theft-of-property when he knowingly obtained by deception control over between $1,500 and $2,500 belonging to Mary Mwai with the intent to deprive her of her property; when he knowingly obtained by deception control over $2,400 belonging to Cesar Perez-Martinez and Angelica Romo-Duarte with the intent to deprive them of their property; and when he knowingly obtained by deception control over $2,400 belonging to Victor Huerta-Cazares and Esmeralda Penaflor-Nunez with the intent to deprive them of their property and (2) that Cooner committed first-degree perjury when he knowingly swore falsely in applications for asylum for Perez-Martinez and Huerta-Cazares when he asserted that they faced gang-related threats in their home country of Mexico, and those false statements were material to the applications for asylum. Specifically, the evidence showed the following.
Mary Mwai hired Cooner, an immigration attorney, to assist her in obtaining legal status after she married a United States citizen. Mwai testified that she mainly dealt with a woman named Adela, who was one of Cooner's employees. On August 5, 2014, Mwai paid Cooner $1,300.[3] Mwai testified that she later paid Cooner $1,500 for "immigration" and that she was told that Cooner's office did not give receipts for that specific transaction but that she would receive a receipt in the mail. Two weeks after Mwai paid the $1,500, Adela called Mwai and told her to bring $1,500 to Cooner's office, once again for "immigration." Mwai went to Cooner's office, where both Cooner and Adela claimed that Mwai had never submitted the initial $1,500 "immigration" payment. Cooner told Mwai she needed to pay $1,500 in order for him to proceed with her case. Mwai testified that she eventually retained a different attorney and that her case progressed. Mwai requested a refund from Cooner but never received one.
Cesar Perez-Martinez and his wife, Angelica Romo-Duarte, hired Cooner to assist them in obtaining legal status in the United States; they each testified that at no time were either of them seeking asylum.
*210 On July 28, 2014, they met with Cooner, signed an attorney-client representation agreement, and paid a $1,500 retainer.[4] Cooner estimated that the entire case would cost between $5,000 and $6,000. After signing the agreement, Perez-Martinez and Romo-Duarte dealt mostly with a woman named "Coco,"[5] one of Cooner's employees. Coco told Perez-Martinez and Romo-Duarte that the more money they paid, the more quickly their case would progress.
Romo-Duarte testified that they received a notice from the United States government directing them to submit their fingerprints to the Department of Homeland Security ("DHS"). After doing so, Romo-Duarte contacted Coco to inquire about the next step in their case. Coco told Romo-Duarte to pay a $400 legal fee, which she and Perez-Martinez paid on September 10, 2014.[6] Romo-Duarte testified that this fee was not specified in the agreement. On January 23, 2015, Perez-Martinez and Romo-Duarte went to Cooner's office to pay him $500.[7] While there, Romo-Duarte spoke with Cooner, who told her that "everything was good because we got the fingerprints and all this stuff and everything will be okay." (R. 376.)
Victor Huerta-Cazares and his wife, Esmeralda Penaflor-Nunez, hired Cooner to assist them in obtaining green cards; Huerta-Cazares testified that at no time were he or Penaflor-Nunez seeking asylum. On February 4, 2014, they signed an attorney-client representation agreement and paid a $1,500 retainer fee.[8] After signing the agreement, Huerta-Cazares and Penaflor-Nunez dealt mostly with Coco. Huerta-Cazares testified that someone from Cooner's office "would give us a call to go there and go see them and make a payment for something."[9] (C. 320.) With respect to documents Cooner filed on his behalf, Huerta-Cazares testified that the office staff asked him only to confirm his name and address and to sign the documents. Huerta-Cazares stated, "I never went through them with nobody. I said I went and signed where they told me to sign." (R. 323.)
The State introduced the asylum applications Cooner had prepared for Perez-Martinez, Romo-Duarte, Penaflor-Nunez, and Huerta-Cazares as portions of its Exhibits 1, 2, 6, and 7, respectively. Each application indicated that the applicant was seeking asylum or the withholding of removal based on political opinion, membership in a particular social group, and torture convention. A box marked "Yes" appeared in each application under the following questions: "Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?";[10] "Do you fear harm *211 or mistreatment if you return to your home country?"; and "Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?" (C. 301-02; 521-22; 585-86; 615-16.) The following language appeared in each application:
"I was threatened by gang members in my neighborhood to sell drugs and commit crimes or my family and I would pay a horrible price.
"....
"When I left for the United States they told family members that I could not hide and sooner or later I would be back and they would get me. I believe they would seek revenge, even though I left years ago. In Mexican small villages everyone knows everyone and the police are corrupt and don't help the people.
"....
"I fear the gang members in my hometown."
(C. 301-02; 521-22; 585-56; 615-16.) Perez-Martinez, Romo-Duarte, and Huerta-Cazares all testified that they did not express to Cooner or his employees any fear of gang members in their hometowns. Perez-Martinez, Romo-Duarte, and Huerta-Cazares each identified Cooner in court.
During Cooner's trial, Charles Kuck, an immigration attorney and professor of law at Emory University, testified as an expert in the field of immigration law. Kuck testified that all applicants seeking the protection of the United States must show that they fear persecution in their home country based upon their race, nationality, religion, political opinion, and/or being part of a socially visible group subject to persecution from either their government or a group their government cannot control. Kuck testified that an individual seeking asylum signs the application under penalty of perjury and stated, "You don't have to raise your right hand and swear. By signing it, you are saying that this information is true and correct." (R. 284-85.) Kuck explained "why it's a bad idea to file a petition for asylum where you know you have no grounds for a petition for asylum," stating:
"Well, if you file an application for asylum and you're not qualified for it, either because it's not one of the five grounds or you waited too long, it's longer than a year, you are going to be put into deportation proceedings. That is going to happen. It might take three years, but you will absolutely be put in deportation proceedings. And if you've been in the country illegally for 10 or 15 years or 5 or 8 years and you're in deportation proceedings, your chance of being deported is excellent, very, very high. You're looking at grant rates of asylum in immigration court in Atlanta[11 ] between one and two percent. That means 1 to 2 percent of the people that apply for asylum is granted; 98 or 99 [percent] are going to be deported. So basically if you file for asylum and you really don't have a case, you're going to be deported. It's just a matter of time."
(R. 306-07.)
The State's evidence at trial also showed: (1) that Cooner committed third-degree perjury when he swore falsely during immigration proceedings associated with Perez-Martinez that he was an attorney in good standing and not subject to any order of any court suspending or disbarring him from practicing law and (2)
*212 that Cooner engaged in the unauthorized practice of law when he represented Perez-Martinez, Huerta-Cazares, and Mwai in immigration proceedings after the Supreme Court of Alabama affirmed the Alabama State Bar's order disbarring Cooner from the practice of law. Specifically, the evidence showed the following.
In his attestation to the immigration court in Perez-Martinez's case filed on September 18, 2014, Cooner stated that he was a member of the Puerto Rico Supreme Court Bar, that he was eligible to practice law, that he was a member in good standing, and that he was not subject to any order disbarring, suspending, or otherwise restricting him in the practice of law. The same was true in his representation of Huerta-Cazares and Mwai. Contrary to Cooner's attestation, however, the record indicates that the Alabama Supreme Court notified the Alabama State Bar ("the ASB") that, effective September 10, 2013, Cooner was "disbarred and excluded from the practice of law in the courts of Alabama." (C. 724.) The record further indicates that Cooner was not, and never had been, licensed by the Puerto Rico Supreme Court to practice law. Finally, at the time he filed his attestation in Perez-Martinez's case, Cooner had been disbarred from practicing before the Department of Homeland Security, the Board of Immigration Appeals, and the immigration courts.
According to Charles Kuck, only attorneys and "accredited representatives"[12] were permitted to charge fees for their representation of individuals in immigration courts and that a "reputable person" who is not an attorney may represent an individual with permission from an immigration judge. In order to practice as an attorney in immigration courts, Kuck explained, the attorney must be licensed and admitted to practice law in at least one state in the United States and must file a notice to appear for every case in which the attorney is involved. With respect to the notice-of-appearance form, Kuck testified on direct examination by the State:
"This form is used to give to the court typically at the initial start of a hearing that 'I'm a lawyer that's representing this individual or I'm otherwise authorized to represent somebody in immigration court.' It's executed under penalty of perjury. And you sign your name and date it and give it to the court. And the second page of the back of the document, you would then have to give a copy of it to the government lawyer and you certify that you have given a copy to the court.
"....
"[PROSECUTOR:] Can you read the certification, not what's typed in but what's preprinted on the form?
"[KUCK:] There are actually two parts here. The first is a check box where it says 'I am an attorney eligible to practice law and a member in good standing of the bar of the highest court of the following states, possessions, territories, commonwealths, or the District of Columbia, and I am not subject to any order disbarring, suspending or otherwise restricting me in the practice of law.' And then you put in the court that you're a member of. And at the bottom of the first page is a signature line. But above the signature line, it says, 'I hereby enter my appearance as attorney or representative for and at the request of the party named above. I have read and understand the statements provided on *213 the reverse of this form'-and those are preprinted information about appearances and things like that. 'Conditions governing appearances represent before the immigration courts and I declare under penalty of perjury under the laws and methods of America that the foregoing is true and correct.' And then you sign your name and put your ID number for the court and date it."
(C. 287-88.)
Kuck further testified that the Board of Immigration Appeals ("BIA"), as part of DHS, is responsible for attorney discipline and has the authority to suspend attorneys and inform them of their ineligibility to practice in immigration court. According to Kuck, "if somebody is disbarred by a state, then the [BIA] will say that person cannot practice in immigration court." (R. 272.) Moreover, Kuck explained, a suspended attorney cannot represent individuals in immigration court as an accredited representative or a reputable person.
Catherine O'Connell, disciplinary counsel for DHS, echoed Kuck's testimony. Specifically, she testified that she is responsible for matters involving representation and appearances of attorneys and other representatives before the United States Citizenship and Immigration Services, which is the sub-agency of DHS that deals with benefit requests such as obtaining visas and work permits. O'Connell testified that, in order to represent an individual in immigration court, an attorney "has to be eligible to practice law and in good standing in the state where they're licensed. They can't be under any order restricting their ability to practice law. So they can't be suspended or disbarred or inactive." (R. 402.) O'Connell stated that the BIA has the authority to disbar attorneys from practicing in immigration courts and that, "[i]f an attorney has been disbarred by their state, we [as disciplinary counsel] ask that they be disbarred and prohibited from appearing in immigration matters." (R. 404.)
O'Connell testified that she first became aware of Cooner in March 2013 after receiving a complaint from a DHS employee. O'Connell did not begin proceedings against Cooner at that time because she learned that the ASB had disbarred Cooner and that he was appealing the order of disbarment. On January 10, 2014, after learning that the Alabama Supreme Court had issued the final order of disbarment, O'Connell filed a notice of intent to discipline Cooner and recommended that he be disbarred from practicing in immigration court.[13] O'Connell testified that her actions were based entirely upon the disbarment proceedings against Cooner in Alabama. On February 4, 2014, the BIA issued an order immediately suspending Cooner pending the final disposition of the DHS's disciplinary proceeding.[14] On February 7, 2014, Cooner answered the notice of intent to discipline and moved to set aside the order of suspension on the ground that he was "not subject to a final order of disbarment in the State of Alabama" because, he said, the order was "the subject of an appeal currently pending before the Supreme Court of Alabama."[15] (C. 766.) O'Connell testified that she then filed a motion for summary adjudication because the Alabama Supreme Court indicated that its order was final and that Cooner had been disbarred in Alabama. On March 12, 2014, the BIA issued a final order of discipline *214 disbarring Cooner from practicing before the DHS, the BIA, and immigration courts.[16] O'Connell explained that, as a result, Cooner is "basically prohibited from representing people with respect to any immigration matter." (R. 418.) O'Connell testified that, as of February 4, 2014-the date the BIA suspended Cooner-Cooner was no longer permitted to practice in immigration courts but that, because the BIA mails its orders, Cooner was likely unaware that his suspension became effective on that date until he received the suspension order via the mail.
Mark Moody, assistant general counsel for the ASB, testified that the ASB is responsible for, among other things, the licensing and discipline of attorneys in Alabama. Moody explained that the Alabama Rules of Professional Conduct, which are authorized by the Alabama Supreme Court, set forth guidelines for how attorneys must conduct themselves. Moody testified that money given to an attorney by a client as a retainer is supposed to be placed into a client trust fund that is billed against as the attorney performs work-in other words, Moody said, the money is held in trust and is taken out as the attorney earns it. Moody stated that nonrefundable fees charged for work an attorney does not perform are impermissible under the Rules of Professional Conduct.
Moody testified that "[d]isbarment means a lawyer has had his license revoked to practice for a period of five years." (R. 483.) Moody explained the process of disbarment as follows: A complaint is filed against an attorney, and the attorney has 14 days to respond, although extensions are routinely granted. The response is reviewed by at least two attorneys in the ASB's office of general counsel, and those attorneys must agree on the initial disposition of the complaint, which is either to summarily dismiss the complaint or to open an official investigation. If an investigation is opened, it is conducted by the ASB and/or a local grievance committee. After the investigation is complete, a report is submitted to ASB's disciplinary commission, which consists of four attorneys. The disciplinary commission determines the appropriate discipline, which ranges from dismissing the complaint to filing formal charges. If formal charges are filed, the disciplinary commission determines, based on the investigation report, the facts that support the attorney's possible violation of the Rules of Professional Conduct. At that point, the attorney files an answer, and the discovery phase begins. Both parties then file whichever pleadings they deem necessary for their case and, if the case is not settled, a hearing is held before a disciplinary panel. A disciplinary panel consists of a disciplinary hearing officer ("DHO")-whom Moody compared to a trial judge-and three bar commissioners and one layperson-whom Moody compared to a jury. At the conclusion of the hearing, the DHO enters a report and order setting out the findings of fact and resulting punishment. The attorney may then appeal the decision to the Alabama Supreme Court. Once that Court makes a decision and issues a certificate of judgment, the decision is final.
Moody testified that he was assigned to Cooner's case to continue the appeals process after the assistant general counsel handling Cooner's case retired.[17] Moody stated that Cooner had been licensed to *215 practice law in Alabama in 1999. A complaint was filed against Cooner in 2005, and a hearing on that complaint was set for some time in 2008 but did not occur because Cooner requested and was granted multiple continuances. Cooner's hearing was eventually held in 2010, and he was disbarred as a result. Moody testified that the ASB entered three separate orders of disbarment-one in 2010, one in 2012, and one in 2013.[18] The 2010 and 2012 orders of disbarment were remanded by the Alabama Supreme Court; the 2013 order, however, was affirmed, and the certificate of judgment was issued on September 10, 2013. On October 16, 2013, Julia Jordan Weller, the Clerk of the Alabama Supreme Court, notified the ASB of Cooner's disbarment in a letter stating:
"Pursuant to the September 10, 2013, Certificate of Judgment issued by this Court in the matter of Douglas H. Cooner v. Alabama State Bar (Appeal from ASB No. 2002-150(A) ), a notation has been entered on the Supreme Court Roll of Attorneys that Douglas Howard Cooner is disbarred and excluded from the practice of law in the courts of Alabama effective September 10, 2013."
(C. 724.)[19] Moody testified that the ASB reached out to either Cooner or his attorney to inform Cooner that the Alabama Supreme Court had ordered him not to practice law but that the ASB received no response. Moody then contacted DHS to inform it that Cooner's disbarment was final. In addition, the ASB appointed as trustee Freddy Rubio to inventory Cooner's files and return them to Cooner's clients pursuant to Rule 29 of the Alabama Rules of Disciplinary Procedure.[20]
Moody further testified that attorneys licensed to practice in Alabama are required to inform the ASB if they are licensed to practice in any other jurisdictions. According to Moody, he had received information that Cooner had been holding himself out as licensed in Puerto Rico and Tennessee. The ASB contacted the United States District Court in Puerto Rico and the Tennessee Board of Professional Responsibility, which are the licensing agencies for those jurisdictions, and received information showing that Cooner was not licensed to practice law in either Puerto Rico or Tennessee.[21]
Freddy Rubio testified that he is a Birmingham attorney who primarily represents Hispanic immigrants and that he practices mainly in personal-injury law and criminal defense but does not practice immigration law. Rubio stated that he also represents the Birmingham City Council and does some business litigation. Pursuant to Rule 29 of the Alabama Rules of Disciplinary Procedure, the ASB appointed Rubio to serve as trustee over Cooner's client files. Specifically, the February 23, 2015, order appointing Rubio as trustee instructed him
"to secure and inventory the files of Douglas Howard Cooner, to take such action as is reasonable and necessary to protect the interests of Douglas Howard Cooner, and his clients, to secure and audit the trust account(s) of Douglas *216 Howard Cooner, and to send notification of his disbarment to his clients."
(C. 731.) The addendum to that order explained:
"The purpose of [ Rule 29, Ala. R. Disc. P.] is to protect clients' interest when a lawyer has become incapacitated, has disappeared, died, been suspended or disbarred, and has failed to notify his clients of the proper action that they should take. When a trustee is appointed in this situation, it is his/her responsibility to inventory the files and to take other action reasonably necessary to protect the clients' immediate interests. What this usually entails is to notify the clients that they should pick up their file and seek the services of another lawyer. The trustee in this regard can even recommend another lawyer to the clients. Nevertheless, as always, the decision as to which lawyer represents the client is ultimately that of the client."
(C. 733.) Rubio clarified that, when a lawyer is disbarred, a trustee is appointed pursuant to Rule 29 to protect the clients', not the lawyer's, interests.
In March 2015, Rubio was present during the execution of a search warrant at Cooner's law office.[22] According to Rubio, Cooner's law office appeared to be in operation because the lights were on, the telephones were working, and clients came to see Cooner while the search warrant was being executed. On March 24, 2015, Rubio received approximately 2,500 of Cooner's files from the Birmingham Police Department that had been seized as a result of the search; because there were so many files, Rubio had to purchase filing cabinets and rent a storage unit to accommodate them. Rubio testified that the files remained locked and secured in the storage unit and that only his office had direct control of the files.
In an effort to return the files to Cooner's former clients, Rubio separated the active files from the closed files and attempted to contact those clients whose files were open. Rubio testified that, in April 2015, he obtained for his office a telephone number dedicated solely to receiving calls relating to Cooner's cases; that he posted a notice on the door of Cooner's office that listed Rubio's name, his firm's address, and the dedicated telephone number and that stated that Cooner's files were in Rubio's possession; that he used social media and news-media outlets that were oriented to the local Hispanic community to inform Cooner's clients to get in contact with Rubio to obtain their files.
Rubio testified that his office would take names on Mondays through Thursdays of clients wanting to retrieve their files, that an employee dedicated to Cooner's case would retrieve the files, and that on Fridays from noon to 5 P.M., Cooner's clients would retrieve their files. In order to retrieve their files, clients had to show their identification and sign a receipt. Within a one-year period, Rubio had returned approximately 1,000 files to Cooner's former clients. About 95% of people who requested their files received them, while Rubio was unable to locate the remainder of the requested files.
At some point, Rubio became concerned with the cost of storing the files. With the permission of the ASB, he moved the files to a secure, locked location in a building owned by the Hispanic Interest Coalition of Alabama ("HICA"). If Rubio needed to retrieve any files, he collaborated with the *217 immigration attorney who worked at HICA at that time. Rubio testified that he did not release the files to law enforcement because they contained some privileged information.
After the State rested, Cooner moved for a judgment of acquittal on the basis that the State had not presented a prima facie case of each of the charges against him. The trial court denied Cooner's motion. After the defense rested, Cooner renewed his motion for a judgment of acquittal, and the trial court again denied it. As noted above, Cooner was convicted of three counts of second-degree theft of property, two counts of first-degree perjury, one count of third-degree perjury, and three counts of unauthorized practice of law.
On June 29, 2017, Cooner filed a motion for a new trial, arguing, among other things, that "the prosecution failed to prove a prima facie case against the defendant of each and every element of the alleged offenses charged" and that "the court erred in denying the defendant's various pretrial motions concerning spoliation of evidence as a violation of the defendant's due process rights." (C. 219.) Although the case-action-summary sheet shows a June 30, 2017, entry stating "NEW TRIAL/DOCKETED" and a July 5, 2017, entry states "ORDER GENERATED FOR NEW TRIAL-RENDERED AND ENTERED," the record does not contain a transcript for a hearing on Cooner's motion or an order ruling on that motion. Accordingly, we presume that the trial court correctly disposed of Cooner's motion for a new trial.[23]
Discussion
I.
Cooner contends that the trial court erred when it denied his motion to dismiss the indictment against him. (Cooner's brief, p. 31.) According to Cooner, he "was denied due process after the State's agents seized material evidence then destroyed it before trial in bad faith" and, "[w]ithout the information in these files, [he] and his lawyers could not present an effective defense." (Cooner's brief, p. 31.) Specifically, Cooner argues that he
"was unable to show notes and legal memoranda created during client meetings where they discussed the client's basis for asylum. (R. 24.) Cooner could not show the dates when he or his staff completed legal work for the clients to prove he was licensed at the time. (R. 24.) Cooner could not prove he appealed his disbarment from the U.S. Immigration Court because his documents were destroyed. (R. 771.)."
(Cooner's brief, p. 36.)
On July 25, 2016, Cooner filed a motion to require the State "to produce any and all legal files, memoranda or other matters seized from [his] office or person ... and to make it available immediately for use in the preparation of a defense." (C. 80.) Cooner argued that, without such production, he would be denied due process, compulsory process, and an opportunity for a fair trial because, he said, the requested *218 items were relevant to his defense and "likely contain[ed] important matters for the impeachment of prosecution witnesses." (C. 79.) Cooner stated that, in the event the State could not or would not produce the items, "dismissal of the indictment [was] the only remedy available for such loss or spoliation of necessary evidence."[24] (C. 80.)
On December 6, 2016, Cooner filed a renewed motion to dismiss the indictment against him.[25] Cooner alleged that the State's case was "predicated on evidence of legal work seized by the State" from his law office and that, "[i]n order to adequately defend himself, [Cooner was] entitled to review the exact files of individuals whose complaints formed the basis of the indictments" against him. (C. 124.) Cooner stated that, although several paper files, boxes, and computers were eventually returned to him, those "items were either destroyed or in complete disarray." (C. 125.) Furthermore, Cooner stated that he was "unable to locate any single file which relates to the parties named in the indictments" and that those files contained information that was material to his defense. (C. 125.)
The State responded that Cooner's argument did not meet the requirements of Scott v. State, 163 So.3d 389 (Ala. Crim. App. 2012), because, it said: (1) the State did not act in bad faith because the property was seized pursuant to a valid search warrant and was "placed in the care and custody of the Alabama State Bar pursuant to an order authorized by the laws of Alabama" (C. 135); (2) the seized property was not material to Cooner's defense because the State would not be relying on the seized property as evidence in its case-in-chief; and (3) Cooner had suffered no prejudice to his defense.
On January 11, 2017, the circuit court held a hearing on Cooner's motion. The State asserted that it was "not going to use the evidence seized as part of the State's evidence" but instead would use "official records of the court clerk" to prove its case. (R. 7-8). The circuit court responded that the seized evidence was potentially exculpatory and that Cooner was unable to determine its exculpatory value because it could not be retrieved. The following discussion occurred:
"[THE STATE]: ... [W]hat [Cooner] did file [with the immigration court] is coming into evidence. We've met with the defense counsel. We've shown them the discovery. We've shown them what we intend to introduce. You know, we've shown them what we believe are the perjurious statements that this defendant said when he said he had no pending disciplinaries and was a lawyer in good standing and when he said something that his clients say 'We never represented that we qualified for asylum by being in fear of our lives if we go back to our homeland.' You know, what could be in the file to disagree with that? And there's been no representation. The motions *219 have merely said there's exculpatory evidence. Well, we feel respectfully, Your Honor, that he can't say there may be exculpatory evidence in that. He's the one that's in possession of those files. If there was something in there, we think he should have to plead what's in the file that would prove 'I'm not guilty of this crime or would tend to prove I'm not guilty of this crime' is fill in the blank, whatever it is that he thinks would be in the file. We can't dispute a vague reference to where he says-
"....
"THE COURT: Well, let me ask you this, did you have the names of the people he allegedly took money from when he was disbarred? Why wouldn't you just write a search warrant to go in there and retrieve just the files involved in the alleged criminal activity instead of all the files in his possession?
"[THE STATE]: Judge, we also as we were proceeding we were having to deal with his clients filing U-visa applications. And U-visa is where someone gets a visa based on the fact that they are a material witness. And even though we're not indicting a particular case, they can apply for U-visa. We need to know that they are his clients. They need to be able to talk to Mr. Rubio and for us to be able to verify that, indeed, they are a material witness to a crime in which he perpetrated. There's a variety of reasons why we felt we needed those items. And in particular while the Birmingham Police Department didn't have space to store all these things, the state bar did. And if that was in error, then-
"THE COURT: Well, I don't know. But I'm just reading the language of the statute. The warrant itself says 'to seize financial records showing payment to the defendant by any client of said law service.' I don't know how long Mr. Cooner has been practicing law but that covers a lot of ground. I mean, you just go in there and seize everybody's records whether they're-any allegation that there was any criminal activity in all these other files or not? Is that what this search warrant provides for?
"[THE STATE]: Well, Judge, if we were here about a suppression motion, I guess I could talk to you about that. But we've already said we're not intending to prove-
"THE COURT: Well, let's just assume there were files that were seized that really don't show any evidence of any crimes.
"[THE STATE]: Yes, sir.
"THE COURT: Shouldn't the defendant have the right to get those files back?
"[THE STATE]: We gave him back every file we were still in possession of. The only files that-
"THE COURT: You're talking about what you're in possession of. But see, y'all have turned them over to the state bar. So you don't know what they did with them, do you?
"[THE STATE]: Judge, that's accurate. The representation we have is that the files that weren't returned to him were returned to the actual clients. "....
"[DEFENSE COUNSEL]: The indictments on the theft charges with the specific victims that the State has alleged, the indictments came down on March 6th, 2015. The search warrant was executed. And all these files and computers and other items were seized by the police and eventually turned over to the state bar and the trustee on March 23rd, 2016. Judge, at the time-
"....
*220 "... At the time of the procedure, the State knew who the victims of these theft charges were. And the State could have, as the Court stated, that the State of Alabama could have simply seized those files for those individuals. But they took everything. They took seven computers with the serial numbers that are listed on the search warrant return. And on the search warrant return, it lists assorted files and boxes. And it's a very vague statement as far as what was taken. There was never any inventory of items that were seized that was given to Mr. Cooner. And when the items were ultimately returned earlier this year, there was never any inventory of what was returned.
"....
"And, Judge, before I call a witness, the State needs to prove intent as far as the theft cases and the contents of the files and the contents of the computers. And our position is that they are essential to defending against statements, elements of the crime. As far as-and we set this out in our reply to the motion to dismiss. The loss or misplacement or the intentional actions by the State through the trustee of giving away these files without making copies was intentional and that those intentional actions have deprived Mr. Cooner from being able to look at these files from however many years ago that would have contained work product, that would have contained notes, that would have contained any [of] a number of things that would have helped us to defend against the theft charges.
"In this case and in this sort of situation, Mr. Cooner is also clearly prejudiced by not having these files and not having the opportunity to look back over these 20 or so files from these alleged victims to refresh himself about the facts of these particular cases and what was going on and what may or may not have been done in these cases at the time.
"I guess the last thing I want to mention before we call our witnesses, the State mention-[the prosecutor] mentioned Scott v. State, the arson case. And we set this out in our reply. In that case, the defense, number one, did not allege any sort of bad faith on the part of the State losing that electrical outlet. The defense alleged that it was negligent misplacement of the evidence, and there was no bad faith. There was no intentional action there. The other thing that's relevant with that case is the defense did not argue that particular outlet caused the fire. It wasn't really relevant to defending the arson case. In this case, these files are very relevant to defend the theft charges against Mr. Cooner.
"[THE STATE]: And, Judge, that's our point. That's the first point. How are they relevant? They still haven't said-
"....
"THE COURT: Well, intent is involved in theft. It has to be intentional. And, of course, the statute and the caselaw set out the elements of theft without having to go into all that .... And I have a real problem when law enforcement seizes evidence pursuant to a search warrant and then immediately, the same day they seize it, they don't catalog it. They don't do an inventory of it. They just seize it. And the same day they seize it, they turn it over to the state bar, because apparently they've done no analysis from a criminal standpoint prior to turning it over to the state bar. Don't you see a problem with that, [prosecutor]?
"[THE STATE]: Judge, obviously I don't see as much of a problem as Your Honor. ...
*221 "THE COURT: ... I mean, you know, this is not just a simple, okay, the State lost the evidence. They absolutely did nothing to preserve it, in fact, because the minute they seize it, they turn it over to an independent body that's really not concerned with preserving evidence in a criminal case.
"[THE STATE]: Judge, that body was responsible according to the commission-
"THE COURT: Those [Bar] rules do not supersede criminal procedure or criminal caselaw.
"....
"We don't even know for sure what was seized because the inventory attached to the search warrant is very vague, just very vague.
"[DEFENSE COUNSEL]: And another reason these files are-another two reasons these files are going to be critical to our defense in the theft cases is that, number one, Mr. Cooner had several people working for him. And number two, his clients were Spanish speakers, and Mr. Cooner doesn't speak Spanish. So he had somebody interpret for the clients and somebody adding notes to the files and work product. Mr. Cooner is not going to be able to remember based on his personal knowledge from any particular client from however many years ago what happened because he may not have had these conversations that led to notes or memos being placed in the files or work product being done. That would have been the support staff's ability to speak and communicate with clients in Spanish."
(R. 11-25.)
Adela Abdeh, the office manager of Cooner's law firm at the time the search warrant was executed in 2015, testified that law enforcement seized several paper files, seven computers, boxes, bookshelves, file cabinets, and external hard drives from Cooner's office. According to Abdeh, the office had eight large file cabinets that stored both active and closed paper files, and the computers were all working properly when they were seized. Abdeh stated that, when the items were returned, the bookshelves were returned in parts, three file cabinets were missing, and they received three garbage bags containing files with "papers mixed together." Abdeh testified that "no one returned [the property] exactly how they took it;" that some of the files were not returned at all; that, of the files that were returned, some were missing documents; and that the files of the named victims in the theft cases were not returned. (R. 37.) With respect to the computers, only four were returned and, of those four, only one was returned in usable condition. Specifically, Abdeh testified that one computer was visibly damaged and that "you [could] jiggle it around like a present and hear things shaking around"; one computer's "mother board [was] burned"; and the other computer's power supply was burned. (R. 40.)
Abdeh testified that a typical client paper file contained legal memoranda, notes-including those taken during client interviews-client questionnaires, any evidence the clients provided, and receipts for payments from clients and that the computers did not contain all the information that was contained in the paper files. Abdeh testified that Cooner spoke only English and confirmed that the files contained "notes and memos and client information that would have been translated by [her] or by other people from whatever language the client spoke in English to Mr. Cooner." (R. 38-39.)
Following the hearing, the circuit court expressed its "serious reservations" with respect to the State's search, seizure, and handling of the evidence. The court, however, *222 denied Cooner's motion to dismiss the charges as too severe a sanction.
"According to Gurley [v. State, 639 So.2d 557 (Ala. Crim. App. 1993),] we must examine: (1) the culpability of the State; (2) the materiality of the lost or destroyed evidence; and (3) the prejudice that the defendant suffered as a result of that loss." Scott v. State, 163 So.3d 389, 445 (Ala. Crim. App. 2012).
A. Culpability of the State
" ' "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." [Arizona v.] Youngblood [, 488 U.S. 51] at 58, 109 S.Ct. [333] at 337 [102 L.Ed.2d 281 (1988) ]. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959).'
" Ex parte Gingo, 605 So.2d 1237, 1240-41 (Ala. 1992).
Pickering v. State, 194 So.3d 980, 984-85 (Ala. Crim. App. 2015).
There is no evidence in the record indicating that the State, law enforcement, or Rubio[26] were aware of the exculpatory value of the evidence at the time it was lost or destroyed. In fact, Cooner did not allege in what way that the seized evidence was exculpatory, only that it was potentially exculpatory. Although the State's actions in the search, seizure, and handling of the evidence may very well have been negligent, we cannot say that the State acted in bad faith in this instance.
B. Materiality of the Contents of the Client Files
" 'To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " Scott, 163 So.3d at 445-46 (quoting California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ).
Again, nothing in the record indicates that the evidence in this case possessed an exculpatory value that was apparent-either to the State or the defense-before the evidence was lost or destroyed. Moreover, Cooner was able to obtain comparable evidence via the testimony of his former employees, Abdeh and Marie "Coco" Duran.[27] Therefore, we cannot say that the contents of the lost or destroyed client files was material to Cooner's case.
C. Prejudice to Cooner
The record does not show that the State used any evidence gleaned from the lost or destroyed client files in its prosecution against Cooner. In addition, during the hearing on Cooner's renewed motion to dismiss, the State asserted that it had given Cooner access to the discovery in this case, and Cooner did not challenge that assertion. Therefore, we cannot say that Cooner was prejudiced in this regard. Accordingly, Cooner is not entitled to relief on this issue.
*223 II.
Next, Cooner contends that the State used an improper "general search warrant" to search for and collect evidence from his law office. (Cooner's brief, pp. 56-60.) According to Cooner, the evidence collected by law-enforcement officers included thousands of client files, computers, digital hard drives and other items not directly related to the victims in his case. (Cooner's brief, pp. 58-59.) Cooner argues that, because of the "general nature" of the search warrant, the evidence collected from his law firm by law-enforcement officers should have been suppressed and his convictions are due to be reversed. (Cooner's brief, p. 60.) For the reasons provided herein, we disagree.
The Fourth Amendment to the United States Constitution expressly provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Similarly, Alabama law mirrors this constitutional requirement and provides: "A search warrant can only be issued on probable cause, supported by an affidavit naming or describing the person and particularly describing the property and the place to be searched." § 15-5-3, Ala. Code 1975.
With regard to the Fourth Amendment's particularity requirement for search warrants, this Court has stated:
" 'The purpose of the Fourth Amendment particularity requirement is to prevent "[g]eneral exploratory searches." Palmer v. State, 426 So.2d 950, 952 (Ala. Crim. App. 1983). "General exploratory searches and seizures, with or without a warrant, can never be justified and are forbidden and condemned." Id. (citing Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L. Ed. 231 (1927) ). In Ex parte Jenkins, 26 So.3d 464, 474 (Ala. 2009), the Alabama Supreme Court explained that "the requirements of particularity [of a search warrant] are met if the substance to be seized is described with reasonable particularity which, in turn, is to be evaluated in light of the rules of practicality, necessity, and common sense." (internal citations and quotations omitted).'
" Green v. State, 61 So.3d 386, 390-91 (Ala. Crim. App. 2010). In State v. Jenkins, 26 So.3d 458 (Ala. Crim. App. 2007), aff'd, 26 So.3d 464 (Ala. 2009), this Court explained:
" ' "The specific command of the Fourth Amendment to the Constitution of the United States is that no warrants shall issue except those 'particularly describing the ... things to be seized.' "
" ' "However, the description of things to be seized contained in the warrant under review is not so broad that the authorization constitutes a general exploratory search. Certainly, 'an otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based.' VonderAhe v. Howland, 508 F.2d 364 (9th Cir. 1974) ; W. LaFave, 2 Search and Seizure, Section 4.6, n.11 (1978) (hereinafter Search )."
" ' "However, a less precise description is required of property which is, because of its particular character, contraband.
" ' " ' "If the purpose of the search is to find a specific item of property, *224 it should be so particularly described in the warrant as to preclude the possibility of the officer seizing the wrong property; whereas, on the other hand, if the purpose is to seize not a specific property, but any property of a specified character, which by reason of its character is illicit or contraband, a specific particular description of the property is unnecessary and it may be described generally as to its nature or character." '
" ' "2 Search, p. 101, citing People v. Schmidt, 172 Colo. 285, 473 P.2d 698 (1970)." '
" ' Palmer v. State, 426 So.2d 950, 952 (Ala. Crim. App. 1983).'
" 26 So.3d at 463."
C.B.D. v. State, 90 So.3d 227, 243-44 (Ala. Crim. App. 2011).
In his affidavit supporting the finding of probable cause for issuance of a search warrant for Cooner and his law office, Detective Thomas Bailey with the Birmingham Police Department stated:
"I, Detective Thomas L. Bailey, am a Detective assigned to the Birmingham Police Department's Financial Crimes Unit. The Financial Crimes Unit is responsible for investigating financial crimes in Birmingham, Jefferson County, Alabama. Specifically, I have been assigned to investigate numerous cases of Theft by Deception involving Douglas Cooner (white male, DOB: 1/20/1955), that have occurred over the last two years at Cooner's law office, located at or near 1901 Richard Arrington Jr. Blvd. South, Unit # 8. Birmingham, Jefferson County, Alabama, 35209. Specifically, dozens of Hispanic immigrants, local attorneys, and non-profit groups have made complaints with the Birmingham Police Department, alleging Cooner has taken money from the immigrants to represent them in immigration courts and proceedings, but Cooner has allegedly not performed with any intention to actually represent the purported clients.
"Based on these complaints, I contacted the Alabama State Bar, who conveyed the following: On or about 6/20/2013, the Disciplinary Board of the Alabama State Bar issued a report and order disbarring Cooner from the practice of law in Alabama. On or about 9/10/2013, the Supreme Court of Alabama affirmed the report and order. Consequently, on or about 1/15/2014, the U.S. Department of Homeland Security initiated disciplinary proceedings against Cooner and petitioned for Cooner's immediate suspension from practice before the Department of Homeland Security, the Board, and the Immigration Courts as of 2/4/2014. I verified this information with the Department of Homeland Security. Defendant Cooner has alleged membership in other State Bars including Tennessee and Puerto Rico, but has failed to provide any proof and failed to address that these 'bar associations' are not licensing organizations, but rather are voluntary legal organizations. The Alabama State Bar has appointed local attorney Freddie Rubio as the Trustee of Cooner's law practice.
"Despite the above findings, the defendant continued to collect money from numerous victims for services the defendant could not legally provide and in fact did not provide in any meaningful way. I continued my investigation by interviewing victims and using photographic line-ups for those victims. As a result, Cooner was indicted by the Jefferson County Grand Jury for several charges including Theft of Property in the First degree, Theft of Property in the Second degree, Unauthorized Practice of Law (in the past 12 months), and the Criminal *225 Coercion of one employee of a non-profit who explained the disbarment status of Cooner to various complainants.
"According to my discussions with the Immigration Courts, Cooner continues to represent himself as an attorney at his law office located at or near 1901 Richard Arrington Jr. Blvd. S., Unit # 8, Birmingham, Jefferson County, Alabama, 35209. A sign in front of Cooner's office displays his name and the name of his purported law office (Civil and Immigration Law Firm). Additionally, Homeland Security indicated Cooner has made over one hundred filings in the past year in Immigration Courts, after Cooner was disbarred.
"Evidence of the above stated crimes, as well as documentation of other victims, is contained within the business records of Defendant Cooner's law practice. This evidence includes records showing Defendant Cooner's continued practice of law, records showing payments by victims obtained by deception, certificates or lack of certificates of licensing for the practice of law, and other items showing the continued taking of funds by deception from various 'legal' clients. These items should be contained in the law office of Douglas H. Cooner."
(C. 106-107.) The search warrant issued in light of the facts and probable cause identified in Detective Bailey's affidavit authorized law-enforcement officers to search:
"THE FOLLOWING PERSON(S), PLACE OR THING:
"The law office of the defendant (Douglas Cooner WM 1/20/55), that resides in the lower level of the building at 1901 Richard Arrington Blvd. S. # 8 Birmingham, AL 35209. A more specific description being, an office suite labeled as 'Law Officers of Douglas Cooner,' the 'Civil and Immigration Law Center,' or such other label indicating the law offices housing the practice of Douglas Cooner.
"FOR THE FOLLOWING PROPERTY:
"All files and computer files contained at the law office of the defendant (Douglas Cooner WM 1/20/55), that resides in the lower level of the building at 1901 Richard Arrington Jr. Blvd. S. # 8 Birmingham, AL 35209. This includes, but is not limited to paper files of the law practice, electronic storage devices (disks, drives, ...), electronic devices capable of storing data (computers, tablets, ...), or other similar property.
"All documents or items related to licensing by any State or Federal authority including but not limited to certificates or correspondence and any membership in non-licensing bodies related to attorney membership including but not limited to the Tennessee Bar Association and the Puerto Rico Bar Association.
"Financial records showing payment to the Defendant by any client of said law practice. This includes, but is not limited to, bank records, check books, or other documents. Specifically, this includes all records related to any client trust fund.
"Any United States Currency obtained in the law office."
(C. 108.)
Cooner argues that the search warrant in his case was so broad that law-enforcement officers were able to collect and retain thousands of files and other items from his office that, he says, had no connection to the victims in his case. (Cooner's brief, p. 60.) According to Cooner, law enforcement's decision to collect every single file from his office constituted an improper exploratory search and any evidence seized as a result of that search *226 should have been suppressed. Id. We disagree.
The descriptions of the files and records to be seized from Cooner's law practice as they are identified in the search warrant quoted above are not "broader than can be justified by the probable cause upon which the warrant was based" described in Detective Bailey's affidavit. C.B.D., 90 So.3d at 244 (internal quotation marks omitted). Additionally, each piece of property that was to be seized was "so particularly described in the warrant as to preclude the possibility of the officer seizing the wrong property." Id. (internal quotation marks omitted). Under these circumstances, the search warrant in the present case adequately described with reasonable particularity what places were to be searched and what evidence was to be seized.[28] Thus, Cooner is not entitled to relief on this issue.
III.
Finally, Cooner contends that the trial court erred when it denied his motions for a judgment of acquittal because, he says, the State failed to present sufficient evidence to sustain his theft-of-property and perjury convictions.[29] (Cooner's brief, pp. 61-67.) Specifically, Cooner argues that "[n]o evidence was presented at trial from which a jury could infer that [he] intended to deprive his clients of their property or falsely testify." (Cooner's brief, p. 61.)
This Court has repeatedly held that
" ' " '[i]n determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.' " Ballenger v. State, 720 So.2d 1033, 1034 (Ala. Crim. App. 1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). " 'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.' " Nunn v. State, 697 So.2d 497, 498 (Ala. Crim. App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464 (Ala. Crim. App. 1992). " 'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.' " Farrior v. State, 728 So.2d 691, 696 (Ala. Crim. App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala. Crim. App. 1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).
" ' "The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference *227 could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala. Cr. App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala. Cr. App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala. Cr. App. 1983).' "
" Gavin v. State, 891 So.2d 907, 974 (Ala. Crim. App. 2003), cert. denied, 891 So.2d 998 (Ala. 2004) (quoting Ward v. State, 610 So.2d 1190, 1191 (Ala. Crim. App. 1992) )."
Arnold v. State, [Ms. CR-16-0789, December 15, 2017] --- So.3d ----, ---- (Ala. Crim. App. 2017).
"In addition,
" ' "[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant's guilt. Ward v. State, 557 So.2d 848 (Ala. Cr. App. 1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis of guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 368 So.2d 871 (Ala. Cr. App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979)." '
" Lockhart v. State, 715 So.2d 895, 899 (Ala. Crim. App. 1997) (quoting Ward v. State, 610 So.2d 1190, 1191-92 (Ala. Crim. App. 1992) )."
Graham v. State, 210 So.3d 1148, 1154 (Ala. Crim. App. 2016). "As this Court has stated:
" '[B]ecause intent is a state of mind, it is rarely susceptible of direct or positive proof. Instead, the element of intent must usually be inferred from the facts testified to by the witnesses together with the circumstances as developed by the evidence. Seaton v. State, 645 So.2d 341, 343 (Ala. Crim. App. 1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala. Crim. App. 1986) ).... " '[T]he intent of a defendant at the time of the offense is a jury question.' " C.G. v. State, 841 So.2d 281, 291 (Ala. Crim. App. 2001), aff'd, 841 So.2d 292 (Ala. 2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala. Crim. App. 1993).'
" Pilley v. State, 930 So.2d 550, 564-65 (Ala. Crim. App. 2005)."
Lansdell v. State, 25 So.3d 1169, 1178-79 (Ala. Crim. App. 2007). With these principles in mind, we address Cooner's claim as to his second-degree theft-of-property convictions and his first-and third-degree perjury convictions below.
A. Theft-of-Property Convictions
With respect to his theft-of-property convictions, Cooner was charged as follows:
"The Grand Jury of said county charge that, before the finding of this indictment, DOUGLAS HOWARD COONER, whose name is to the Grand Jury otherwise unknown, did knowingly obtain, by deception, control over $2,400.00 of the lawful currency of the United States of America, the property *228 of CESAR PEREZ-MARTINEZ and ANGELICA ROMO DURATE,[30 ] with the intent to deprive the owner of said property, in violation of Section 13A-8-4(a), of the Code of Alabama, against the peace and dignity of the State of Alabama."
(C. 66.)
"The Grand Jury of said county charge that, before the finding of this indictment, DOUGLAS HOWARD COONER, whose name is to the Grand Jury otherwise unknown, did knowingly obtain or exert, by deception, control of over $2,800.00 of the lawful currency of the United States of America, the property of MARY MWAI, with the intent to deprive the owner of said property, in violation of Section 13A-8-3(a), of the Code of Alabama, against the peace and dignity of the State of Alabama."[31]
(C. 67.)
"The Grand Jury of said county charge that, before the finding of this indictment, DOUGLAS HOWARD COONER, whose name is to the Grand Jury otherwise unknown, did knowingly obtain, by deception, control over $2,400.00 of the lawful currency of the United States of America, the property of VICTOR HUERTA-CAZARES and ESMERALDA PENAFLOR-NUNEZ, with the intent to deprive the owner of said property, in violation of Section 13A-8-4(a), of the Code of Alabama, against the peace and dignity of the State of Alabama."
(C. 67-68.)
In Alabama, "[t]he theft of property between one thousand five hundred dollars ($1,500) in value and two thousand five hundred dollars ($2,500) in value, and which is not taken from the person of another, constitutes theft of property in the second degree." § 13A-8-4(a), Ala. Code 1975. Section 13A-8-2(a)(2), Ala. Code 1975, provides that a person commits the crime of "theft of property" if he "[k]nowingly obtains by deception control over the property of another, with intent to deprive the owner of his or her property." Under Alabama law, the phrase "obtains or exerts control over property" includes but is not necessarily limited to, the taking, carrying away, or the sale, conveyance, or transfer of title to, or interest in, or possession of, property." Finally, section 13A-8-1(1), Ala. Code 1975, provides that "deception" occurs when a person knowingly:
"a. Creates or confirms another's impression which is false and which the defendant does not believe to be true; or
"b. Fails to correct a false impression which the defendant previously has created or confirmed; or
"c. Fails to correct a false impression when the defendant is under a duty to do so; or
"....
"f. Promises performance which the defendant does not intend to perform or knows will not be performed. Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform."
*229 Cooner contends that, in order for him to have been convicted of second-degree theft of property under § 13A-8-4, Ala. Code 1975, the State was required to produce evidence demonstrating that he had the specific intent to deprive his clients of their money. (Cooner's brief, p. 63.) According to Cooner, the State failed to do so. Id. The State contends, however, that it did prove that offense by presenting evidence that, it says, demonstrated how Cooner "systematically charged illegal aliens large sums of money and then did very little work to assist them in obtaining legal resident status." (State's brief, p. 44.) The State further contends that what work Cooner did "was comprised of filing identical asylum forms with immigration services that asserted baseless grounds, which Cooner concocted but were not based on information from the victims." Id.
In addressing this issue, this Court has previously recognized that the specific intent required to support a conviction for theft may be proven by direct evidence or by circumstantial evidence. See C.H. v. State, 225 So.3d 652, 656 (Ala. Crim. App. 2016). Additionally, this Court has also stated that the question of a defendant's intent at the time of the crime is usually for the trier of fact to resolve. See id. As demonstrated below, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner possessed the requisite intent to deprive his clients of their money.
1. Perez-Martinez and Romo Duarte
Cesar Perez-Martinez and his wife, Angelica Romo-Duarte, hired Cooner to assist them in obtaining legal status in the United States; they each testified that at no time were either of them seeking asylum. (R. 217-19, 232.) On July 28, 2014, they met with Cooner, signed an attorney-client representation agreement, and paid a $1,500 retainer.[32] (C. 576; R. 221, 368-69.) After signing the agreement, Perez-Martinez and Romo-Duarte dealt mostly with a woman named "Coco," one of Cooner's employees. Coco told Perez-Martinez and Romo-Duarte that the more money they paid, the more quickly their case would progress. (R. 233, 366, 374.)
Romo-Duarte testified that they received a notice from the United States government directing them to submit their fingerprints to DHS. (R. 372-73.) After doing so, Romo-Duarte contacted Coco to inquire about the next step in their case. Id. Coco told Romo-Duarte to pay a $400 legal fee, which she and Perez-Martinez paid on September 10, 2014.[33] (R. 373.) Romo-Duarte further testified that this fee was not specified in the agreement. On January 23, 2015, Perez-Martinez and Romo-Duarte went to Cooner's office to pay him $500.[34] (R. 366, 375.) While there, Romo-Duarte spoke with Cooner, who told her that "everything was good because we got the fingerprints and all this stuff and everything will be okay." (R. 376.) They later learned, however, that Cooner had filed an asylum application on their behalf that contained false statements indicating that they were seeking asylum in the United States because they had been pressured to sell drugs and were being threatened by Mexican gangs. (R. 230-32.) Neither Perez-Martinez *230 nor Duarte had told Cooner or his staff this information. Id.
Based on the evidence discussed above, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner intentionally deceived Cesar Perez-Martinez and Angelica Romo-Duarte into paying him over $2,400 to help them obtain legal status in the United States when, instead, he used it to submit falsified asylum applications on their behalf. Thus, the evidence presented by the State was sufficient to establish a prima facie case of second-degree theft of property and was sufficient for the jury to find Cooner guilty of that offense beyond a reasonable doubt.
2. Mary Mwai
Next, Mary Mwai hired Cooner to assist her in obtaining legal resident status after she married an American. (R. 341.) Mwai paid Cooner a $1,300 retainer fee in cash and received a receipt. (C. 722; R. 342-43.) After receiving a call from Adela, one of Cooner's legal assistants, Mwai made a subsequent cash payment of $1,500 but was not given a receipt for this payment. (R. 345-46.) Instead, Adela told her that this money was for filing fees and that she would receive a receipt in the mail. (R. 345-46.) Two weeks later, Adela called Mwai and told her that she needed another $1,500 payment, purportedly for more filing fees. (R. 346.) When Mwai disputed the request and explained that she had already made that payment, she was told by Cooner that he could not do any more work until the money was paid. (R. 347-49.) According to Mwai, because Cooner had not done any work on her case, she requested a refund, but she never received one. (R. 349.) She eventually had to retain another lawyer.
Based on the evidence discussed above, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner intentionally deceived Mwai into paying him between $1,500 and $2,500 to help her obtain legal status without intending to help her do so. Thus, the evidence presented by the State was sufficient to establish a prima facie case of second-degree theft of property and was sufficient for the jury to find Cooner guilty of that offense beyond a reasonable doubt.
3. Victor Huerta-Cazares and Esmeralda Penaflor-Nunez
The evidence adduced at trial showed that Victor Huerta-Cazares and his wife, Esmeralda Penaflor-Nunez, retained Cooner to assist them in getting their green cards. (C. 717; R. 313-15; 319-20.) During Cooner's trial, Huerta-Cazares testified that he and Penaflor-Nunez paid Cooner an initial $1,500 retainer for the purposes of using his legal services to secure their green cards. (R. 315.) Huerta-Cazares testified that, after they paid that retainer, someone from Cooner's office would typically give them "a call to go there and go see them and make a payment for something."[35] (C. 320.)
One day, Huerta-Cazares says, he was asked to go to Cooner's office to confirm his name and address and to sign some documents. (R. 323.) When he got to Cooner's office, however, he was simply told where to sign on the documents he was given and that no one ever went through those documents with him. (R. 323.) After signing that paperwork, Huerta-Cazares made subsequent payments of $40, $400, and $500 upon the request of Coco, the *231 legal assistant who handled their case. (C. 720-21; R. 319, 327-28.) After signing that paperwork and making those payments, Huerta-Cazares testified that they never received any notices from immigration services. (R. 326-27.)
During trial, Huerta-Cazares was shown the paperwork that he signed that day. (R. 324-26.) After reviewing the paperwork, Huerta-Cazares testified that he did not realize that the paperwork was an asylum application and not a green-card application. (C. 585-86, R. 324-26.) He was then asked to review the content of the application, which indicated that he had told Cooner that he wanted to apply for asylum in the United States because, according to the application, he and his wife had been pressured by Mexican gangs to sell drugs and they were afraid to return to Mexico for fear of retribution. (C. 585-86.) Huerta-Cazares testified that neither he nor his wife ever told Coco or Cooner that information and never asked them to file an asylum application on their behalf. (R. 324-26.)
Based on the evidence discussed above, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner intentionally deceived Huerta-Cazares and his wife into paying him over $2,400 to help them apply for green cards when, instead, he used it to submit falsified asylum applications on their behalf. Thus, the evidence presented by the State was sufficient to establish a prima facie case of second-degree theft of property and was sufficient for the jury to find Cooner guilty of that offense beyond a reasonable doubt.
B. Perjury Convictions
1. First-Degree Perjury Convictions
Cooner was convicted of first-degree perjury, see § 13A-10-101, Ala. Code 1975, for swearing falsely to material statements in an application for asylum to the effect that Cesar Perez-Martinez and Victor Huerta-Cazares faced gang-related threats in their home country of Mexico. (C. 66, 68.) Under § 13A-10-101, Ala. Code 1975, a person commits first-degree perjury "when in any official proceeding he swears falsely and his false statement is material to the proceeding in which it is made."
For the purposes of Alabama's first-degree perjury statute, an "official proceeding" is defined as "any proceeding heard before any legislative, judicial, administrative or other government agency or official authorized to hear evidence under oath." § 13A-10-100(b)(5), Ala. Code 1975. Additionally, the phrase "swears falsely" is defined as:
"The making of a false statement under oath required or authorized by law, or the swearing or affirming the truth of such statement previously made, which the declarant does not believe to be true. A false swearing in a subscribed written instrument shall not be deemed complete until the instrument is delivered by its subscriber, or by someone acting in his behalf, to another person with intent that it be uttered or published as true."
§ 13A-10-100(b)(1), Ala. Code 1975. Finally, a person's statement is "material to the proceeding in which it is made" if "it could have affected the course or outcome of the official proceeding." § 13A-10-100(b)(2), Ala. Code 1975. Whether a falsification is material in a given factual situation is a question of law. Id.
In his brief on appeal, Cooner states that each client he represented first met with paralegals in his office, who conducted interviews with them to obtain the information necessary to complete certain immigration forms. (R. 666-67.) He further states that additional information was also obtained through questionnaires that, *232 Cooner says, were completed by each of his clients with the help of his legal assistants. (R. 541, 666-667.) Cooner would then use these forms and questionnaires to determine the proper legal course of action for each of his clients. (R. 539.) According to Cooner, all of his clients, including the victims in this case, were always given the opportunity to review and sign the documents before he filed them; thus, he had no reason to doubt the veracity of the information contained within those forms. (Cooner's brief, pp. 66-67.) As a result, Cooner says, the State failed to produce any evidence at his trial demonstrating that he intentionally filed falsified asylum applications on behalf of Cesar Perez-Martinez and Victor Huerta-Cazares. (Cooner's brief, p. 67.)[36] We disagree.
During Cooner's trial, both Perez-Martinez and Huerta-Cazares testified that they never told anyone at Cooner's office that they were seeking asylum because their family had been pressured to sell drugs or had been threatened by Mexican gangs or that they were afraid to return to Mexico for fear of retribution from those gangs. (R. 230-32, 324-26.) Additionally, when they were shown the asylum applications during trial, both Perez-Martinez and Huerta-Cazares testified that they were simply told to verify their personal information and sign the forms. (R. 225, 323.) At no point did anyone from Cooner's office discuss the forms with them or tell them that they were filling out asylum applications. Id.
Under these circumstances, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner swore falsely on applications for asylum that Perez-Martinez and Huerta-Cazares were seeking asylum because their family had been pressured to sell drugs and had been threatened by Mexican gangs and that they were afraid to return to Mexico for fear of retribution from those gangs. Thus, the evidence presented by the State was sufficient to establish a prima-facie case of first-degree perjury and was sufficient for the jury to find Cooner guilty of those offenses beyond a reasonable doubt.
2. Third-Degree Perjury Conviction
Cooner was also convicted of third-degree perjury, see § 13A-10-103, Ala. Code 1975, for falsely swearing during immigration proceedings associated with Perez-Martinez that he was an attorney in good standing and that he was not subject to any order of any court suspending or disbarring him from the practice of law. (C. 66.) Section 13A-10-103, Ala. Code 1975, provides that a person commits third-degree perjury when he "swears falsely."
In his attestation to the immigration court in Perez-Martinez's case filed on September 18, 2014, Cooner stated that he was a member of the Puerto Rico Supreme Court Bar, that he was eligible to practice law, that he was a member in good standing, and that he was not subject to any order disbarring, suspending, or otherwise restricting him in the practice of law. (C. 373-74.) Contrary to Cooner's attestation, however, the record indicates that the Alabama Supreme Court notified the Alabama State Bar that, effective September 10, 2013, Cooner was "disbarred and excluded from the practice of law in the courts of Alabama." (C. 724.) The record further indicates that Cooner was not, and never had been, licensed to practice law in Puerto Rico. (C. 728-29.) Finally, at the time he filed his attestation in Perez-Martinez's case, Cooner had been disbarred from practicing before the DHS, the Board of *233 Immigration Appeals, and the immigration courts. (C. 735-37.)
Based on the evidence discussed above, the State presented sufficient evidence from which the jury could reasonably and fairly infer that Cooner falsely swore during immigration proceedings associated with Perez-Martinez that he was an attorney in good standing and that he was not subject to any order of any court suspending or disbarring him from the practice of law. Thus, the evidence presented by the State was sufficient to establish a prima facie case of third-degree perjury and was sufficient for the jury to find Cooner guilty of that offense beyond a reasonable doubt.
Conclusion
For the foregoing reasons, the judgment of the circuit court is due to be affirmed.
AFFIRMED.
Windom, P.J., and Welch, Kellum, and Burke, JJ., concur.

Cooner was also indicted for one count of first-degree theft of property, see § 13A-8-3, Ala. Code 1975, an additional count of second-degree theft of property, two additional counts of third-degree perjury, and two additional counts of unauthorized practice of law. Those charges were ultimately dismissed. In addition, with respect to one of Cooner's second-degree-theft-of-property convictions, the jury found Cooner guilty as a lesser-included offense of the charged first-degree theft of property.

For each second-degree-theft-of-property and first-degree-perjury conviction, Cooner was ordered to pay a $250 fine, $100 to the Alabama Department of Forensic Sciences, a $50 crime-victims-compensation assessment, and court costs. For each third-degree-perjury and unauthorized-practice-of-law conviction, Cooner was ordered to pay a $100 fine. Cooner was also assessed a $350 bail-bond fee.

The State introduced the receipt for this transaction as its Exhibit 10. The receipt indicates only that the money was paid for "offices." (C. 722.)

The State introduced the agreement as its Exhibit 3 and the receipt for the retainer as part of its Exhibit 4.

The record indicates that "Coco" was a nickname for Marie Duran.

The State introduced the receipt for this transaction as part of its Exhibit 5. The receipt indicates that the money was paid for "filing fees." (C. 577.)

The State introduced the receipt for this transaction as part of its Exhibit 5. The receipt indicates only that the money was paid for "offices." (C. 577.)

The State introduced the agreement as its Exhibit 8 and the receipt for the retainer fee as part of its Exhibit 9.

The State introduced receipts for a June 24, 2014, payment of $400 for "filing fees" and a December 1, 2015, payment of $500 for "office fees" from Huerta-Cazares to Cooner as part of its Exhibit 9. (C. 721.)

Although the "No" box was marked under this question on Huerta-Cazares's application, the space provided under this question contained the following language: "I was threatened by gang members in my neighborhood to sell drugs and commit crimes or my family and I would pay a horrible price." (C. 615.)

Kuck testified that the immigration court with jurisdiction over Alabama residents is located in Atlanta, Georgia.

Kuck explained that accredited representatives are not attorneys. According to Kuck, accredited representatives typically work for nonprofit organizations and charge only nominal fees.

The State introduced the notice of intent to discipline as its Exhibit 20.

The State introduced the suspension order as its Exhibit 18.

The State introduced Cooner's answer to the notice of intent to discipline and motion to set aside the BIA's order of immediate suspension as its Exhibit 21.

The State introduced the final order of discipline as its Exhibit 19.

Moody testified that Robby Lusk was the assistant general counsel who tried the case against Cooner and who handled the initial part of the appeals process.

The State introduced as its Exhibit 14 the judgment page from each order of disbarment. (C. 725-27.)

The State introduced the certificate of judgment and the letter to the ASB as its Exhibit 13.

The State introduced the order appointing Rubio trustee as its Exhibit 17.

The State introduced an affidavit from the Tennessee Board of Professional Responsibility as its Exhibit 15 and a letter from the Clerk of Court of the United States District Court in Puerto Rico as its Exhibit 16.

The record on appeal indicates that the search warrant was issued at 1:50 P.M. on March 23, 2015.

Although Cooner does not challenge the disposition of his motion for a new trial, we note this issue out of an abundance of caution. See Rutledge v. State, 745 So.2d 912, 919 (Ala. Crim. App. 1999) (quoting Jordan v. City of Huntsville, 667 So.2d 153, 156 (Ala. Crim. App. 1995) )(" ' "Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done." ' Stegall [v. State ], 628 So.2d [1006,] 1009 [ (Ala. Crim. App. 1993) ] ; Jolly v. State, 405 So.2d 76 (Ala. Cr. App. 1981)."). There is nothing in the record indicating that Cooner's motion was denied; however, pursuant to Rule 24.4, Ala. R. Crim. P., it would have been denied by operation of law.

On March 9, 2017, following the hearing on Cooner's renewed motion to dismiss the indictment and the circuit court's denial of that motion-the facts of which are set out below-the State responded to Cooner's motion for production and stated that the files of Perez-Martinez, Romo-Duarte, and Huerta-Cazares had been inventoried by Rubio and turned over to those clients but that no file regarding Mwai had been inventoried. Furthermore, with respect to the inventoried files, the State asserted that "the contents were neither copied nor listed. The file[s were] inventoried pursuant to order of the state bar. Further, Trustee Rubio did not work on the files." (C. 154.)

The record does not include Cooner's original motion to dismiss the indictment, nor does it indicate that the circuit court ruled on such a motion.

For the sake of simplicity, we presume, without deciding, that Rubio acted as an agent of the State here.

Abdeh and Duran testified that they had access to and maintained Cooner's client files and that they interacted with Cooner's clients, specifically by translating information from other languages to English.

Moreover, nothing in the record indicates that the State relied on any of the evidence seized as a result of that warrant.

Cooner does not challenge the sufficiency of the State's evidence with respect to his unauthorized-practice-of-law convictions; therefore, we consider those claims to be abandoned on appeal. See Brownlee v. State, 666 So.2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief.").

This spelling appears to be a typo; this name is consistently spelled in the record as "Duarte."

With respect to this charge, Cooner was convicted of second-degree theft-of-property as a lesser-included offense of first-degree theft of property. See (C. 214) ("We, the jury, find the defendant, Douglas Cooner, guilty of Theft in the Second Degree (Property of Mary Mwai the value exceeding $500 but not exceeding $2,500.00), a lesser-included offense of that charged in the indictment.").

The State introduced the agreement as its Exhibit 3 and the receipt for the retainer as part of its Exhibit 4.

The State introduced the receipt for this transaction as part of its Exhibit 5. The receipt indicates that the money was paid for "filing fees." (C. 577.)

The State introduced the receipt for this transaction as part of its Exhibit 5. The receipt indicates only that the money was paid for "offices." (C. 577.)

The State introduced receipts for a June 24, 2014, payment of $400 for "filing fees" and a December 1, 2015, payment of $500 for "office fees" from Huerta-Cazares to Cooner as part of its Exhibit 9. (C. 721.)

Cooner does not challenge the sufficiency of the State's evidence with regard to the "official-proceeding" element of first-degree perjury.